Frank B. PARRISH, Plaintiff,

v.

The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, a corporation, Defendant.

No. 20580.

United States District Court
S. D. California,
Central Division.

June 5, 1957.

John M. Ennis, Los Angeles, Cal., for plaintiff.

Parker, Stanbury, Reese & McGee, by Raymond G. Stanbury, Los Angeles, Cal., for defendant.

YANKWICH, Chief Judge.

Plaintiff was the engineer on a train he operated for the defendant Atchison, Topeka & Santa Fe Railroad, which was involved in a very tragic derailment at Los Angeles on January 22, 1956. His amended complaint seeks the sum of $250,000 as general and $72,000 as special damages because of alleged negli-

gence in the maintenance of the brakes and brake equipment under Section 51, 45 U.S.C.A., of the Federal Employers' Liability Act, and violation by the defendant of Sections 23 and 24 of Title 45 U.S.C.A., commonly known as the Safety Appliance Act.

## I

### The Duty of Carriers to Employees

■ There is thus brought into play the duty of a common carrier under these Sections. Section 23 makes it unlawful to use or permit to be used any locomotive unless it or any parts of it have been inspected as required and are in proper condition and safe to operate. Under Section 51, the common carrier is liable for injury resulting *in whole or in part* from the negligence of any employees or by reason of any defect or insufficiency due to negligence in its cars, equipment, appliances and machinery.

Because these statutory provisions relate to the same matters, many courts have interpreted them together as setting out a complete theory of liability. In McCarthy v. Pennsylvania Ry. Co., 7 Cir., 1946, 156 F.2d 877, 879, the Court said:

"These two Acts are in pari materia, and must be construed together. If the defendant in violation of Section 23 of Title 45 U.S. C.A., furnished the plaintiff's decedent with a locomotive that was defective and unsafe to operate, that would be negligence per se and would authorize an action under Section 51 of the same Title. This has long been the *construction of these statutes.* '* * * If this act is violated, the question of negligence in the general sense of want of care is immaterial. Texas & P. Ry. v. Rigsby, 241 U.S. 43, 36 S.Ct. 482, 60 L.Ed. 834, and cases there cited. But the two statutes are in pari materia, and where the employers' liability act refers to "any defect or insufficiency, due to its negligence, in its cars, engines, appliances," etc., it clearly is the legis-

lative intent to treat a violation of the safety appliance act as "negligence"—what is sometimes called negligence per se.' "

Perhaps the broadest statement of liability under the Safety Appliance Act has been made by the Supreme Court:

"The statutory liability is not based upon the carrier's negligence. The duty imposed is an absolute one and the carrier is not excused by any showing of care however assiduous." Brady v. Terminal R. R. Ass'n, 1938, 303 U.S. 10, 15, 58 S.Ct. 426, 429, 82 L.Ed. 614.

And see, Lilly v. Grand Trunk Western Ry. Co., 1943, 317 U.S. 481, 485, 63 S.Ct. 347, 87 L.Ed. 411; Brady v. Southern R. R. Co., 1943, 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239; Tennant v. Peoria & Pekin R. U. Co., 1944, 321 U.S. 29, 33, 64 S.Ct. 409, 88 L.Ed. 520; Tiller v. Atlantic Coast Line, 1945, 323 U.S. 574, 578, 65 S.Ct. 421, 89 L.Ed. 465; Eglsaer v. Scandrett, 7 Cir., 1945, 151 F.2d 562, 565; Bolan v. Lehigh Valley R. Co., 2 Cir., 1948, 167 F.2d 934, 936; Urie v. Thompson, 1949, 337 U.S. 163, 187–189, 69 S.Ct. 1018, 93 L.Ed. 1282.

However, while the duty as to appliances is absolute, the law does not make the carrier an insurer. There must be a showing of failure to perform the duty (Myers v. Reading Co., 1947, 331 U.S. 477, 485, 67 S.Ct. 1334, 91 L.Ed. 1615) or at least, negligence contributing in whole or in part to the occurrence (Eglsaer v. Scandrett, supra, 151 F.2d at page 565; Rogers v. Missouri Pacific R. Co., 1947, 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493; Webb v. Illinois Central R. Co., 1947, 352 U.S. 512, 77 S.Ct. 451, 1 L.Ed.2d 503).

## II

### No Violation of Duty—The Cause of the Derailment

■ A full consideration of the evidence in the case, after a lengthy trial, leads to the conclusion that the plaintiff has failed to show either negligence in failing to maintain and service the brakes of the Budd cars which were in-

volved in the derailment under Section 51 of Title 45 U.S.C.A., or failure to comply with the duty to maintain safe brakes under Section 23 of Title 45 U.S.C.A. More, regardless of the question of the burden of proof, the preponderance of the evidence shows that the derailment *was not* due to brake failure in violation of either section.

In what follows are stated the grounds for this conclusion.

Immediately after the accident and for a long time thereafter, in a deposition given in one of the first civil actions brought after the accident, and in all the official and unofficial inquiries into the matter, up to and including the plaintiff's appearance before the Grand Jury of Los Angeles County, on February 20, 1956, almost a month after the accident occurred, the plaintiff insisted that the derailment was caused by a momentary black-out *(fugue)* which prevented him from seeing the 15-mile block, that he did not remember the warning of the fireman, Homer Smith, and had no recollection of using the emergency brake. On examination by various physicians, including Dr. Marcus Crahan, psychiatrist for Los Angeles County, he gave the same narrative of the events. In that he was supported by Smith. Smith, while insisting that Parrish saw the signal, and that the emergency brake *was* applied, nevertheless insisted before the Grand Jury that *he did not know what happened.*

It should be stated that so many inquiries had been had relating to the cause of the accident that the Grand Jury Foreman thought to assure the men that they were *under no compulsion* and that they were there to help ascertain what happened. The Grand Jury proceedings disclose the following:

"By Mr. Thorne:

"Q. First, what I want to tell you two gentlemen, we have here nothing at all, there is nobody from the District Attorney's investigators or attorneys, we have nothing but the full Grand Jury, less one, and we want—this is a secret or-ganization, you know that. *I'm not going to give you any oath that you'll tell the truth. We're not going to put you under duress. You can talk very freely, like you were talking to your wife or self, you understand that, Mr. Smith?*

"A. Mr. Smith: Yes.

"Q. We brought you in together purposely. What we'd like to ascertain is two things. Can we make any recommendations to any of the governing authorities or commissions that would help in the future to prevent any kind of an accident like we had here? That's number one. Number two, we would like to ascertain all the information we can from everybody we possibly can, including surgeons and general managers of the railroad, the method of physical examination. Now, we will take them one at a time. Number one will be the safety and I think I'll just ask one or two questions and then we can let the Jury as a whole ask them. Mr. Parrish and Mr. Smith, either one, can answer negative or affirmative, but I thought and it was thought of the Jury, we could do better if you were both here." To these assuring words there was the answer:

"A. Mr. Parrish: *I think that would be very well, yes.*"

The following statement made by Smith further on in the discussion is significant:

"Q. Mr. Smith, do you still believe that the brakes failed on the train?

"A. Mr. Smith: *Well, I never did say they failed. I just don't know what happened. I don't know. It's a mystery to me.*

"Q. I was under the impression— by the time it gets to us second or third-hand—you thought they had failed. A. *I thought they had gone into emergency to control the speed of the train, but I don't know. I*

*still don't know what happened."*
(Emphasis added.)

This corresponds with the statement made by Smith on January 23, 1956, the day after the accident, to A. L. Alexander, Assistant Chief Deputy District Attorney, for Los Angeles County:

"Q. What do you think caused the accident? A. *I don't have any idea, unless something was dragging which derailed us."* (Emphasis added.)

The physical evidence shows clearly that *this was not so.* Equally untenable was Smith's other assumption that *a pipe in the brake might have broken. None had.*

At the investigation conducted by the defendant company on February 2, 1956, the plaintiff gave this complete narrative of what happened from the time he placed his wife in the seat as a passenger on the trip to the time of the derailment:

"Prior to 4:00 o'clock I showed my wife, who accompanied me on this trip, through the cab of the engine, and proceeded to show her, and she was sitting on the front seat, on the left—I mean right side of the engine back of the coffee urn.

"At 5:00 o'clock I went back to the cab and closed the door.

*"We soon made a standing brake test for the car inspectors; received word from them that the brakes set and released properly, and then waited for leaving time.*

"As I recall it was practically on time that the fireman received the signal from the rear; started to leave the depot, and there was the inductor, which we have to acknowledge. We did that, got the bell,—on account of this engine not going to the roundhouse, it was necessary to have this train come to a stop in order to test the equipment. *This was done.*

"The block at the point was red. When the block cleared or went yellow, we went on. I could see that I had the lineup all but one block.

"An S.P. engine was backing from their roundhouse toward the depot, which necessitated holding another block, and we were required to stop for this block.

"The stop was of short duration. We cleared that block, and that gave us a clear lineup. We came around the curve onto the 35-mile track, proceeded until we got the green board just beyond First Street. I intended to allow the engine to attain a speed of not over 55 to 60 miles an hour, which has been my practice. I distinctly remember going under the Fourth Street viaduct, switch engine working on the right-hand side of the yard. *From there on I can't explain what happened but my testimony will not be very good because I have no recollection of passing the usual familiar landmarks, such as the Harvey commissary, the coach yard or any of that.*

*"An illusion or mirage or something in the mental condition which I cannot explain and I don't know if the doctors can, caused me to think that I was going through an orange grove like we pass through between Santa Ana and Orange. I have a memory of being concerned because they didn't keep the trees trimmed so I could see the slow board.*

*"I, in this distorted picture, however, seemed to realize that it was in a dream that I had to respect the 15-mile curve. I don't know whether I am entirely clear but I thought that I clearly remembered the fireman standing on my left and he— I know—I think I know that he made some remark about the 15-mile curve. It seemed to me that he said 'My God, big hole on the 15-mile curve', or words to that effect.*

*"I have no memory of going to emergency.* Whether I put the equipment in emergency or not I

can't say. I think my memory is clear as to when we entered the curve. *I think that I remember the engine swaying to left, to the right, and again to the left and going over. I know that I felt certain that we were going to turn over.*

"My next memory is of being on my feet. I thought I had got up myself but was later told that I didn't. And asked if I could walk. I think that I said, 'yes'. I thought that the fireman attempted to go through the—get through the door into the passenger compartment of the car. It was impossible. I thought then that he climbed up and tried to open the door, the side door of the cab, which was now on top." (Emphasis added.)

Perhaps the most significant piece of evidence in this respect is the letter introduced at the trial written voluntarily by the plaintiff to the legislative representative of his union,—which is Plaintiff's Exhibit I,—on January 28th, six days after the occurrence of the accident. Significantly, it begins:

"Dear Bro. Rex:

*"I wish I might see you and talk to you. I have had a good nights rest and feel good except mentally depressed over the terrible death toll and orphans. My mind is very clear and it is still the same as to what happened in regard to the illusion to my surprise the Physychiatrist and brain specialist understand that, so you see regardless of the outcome of the investigation I could never again run an engine at any rate on the road as I would be afraid it might happen again and God Knows I have done enough damage in this world."* (Emphasis added.)

It is then proposed that the union official intervene with the defendant to have him disqualified temporarily or retired. Significantly, he ends the letter in this manner:

"I am writing this because it occurred to me you might have an opportunity to see Mr. Shelton and speak to him about it. I don't suppose I will have an opportunity to do so. *I also want to make it clear that if none of these things can be done and I am simply out loose there will be no malice or bitterness on my part for I realize that I have caused them a terrible expense as well as untold suffering on the part of a lot of innocent people. If it will serve any purpose you are welcome to let Mr. Shelton or any officer read this letter.*

"In conclusion, I wish to say both Mrs. Parrish and myself *are doing fine and getting the finest of care here,* and I have had about 60 encouraging letters from all over the country. Hoping I have not bored you with this long letter I am
"Yours sincerely
"/s/ Bro. Frank B. Parrish
"Ex Engineer" (Emphasis added.)

I am of the view that the contemporaneous conduct of Parrish, his exclamation to Smith, "Oh, my God, the 15-mile curve", "I have killed my wife", and his "throwing up his hands", as testified to by Smith at the trial, his later statement to the conductor and others after he and the fireman got out of the car, "How bad is it?", "I blacked out", confirm his *original* version as to the cause of the accident. Other circumstances as to his actions immediately before and after the occurrence, such as his failure to use what is known as "the dead man's" brake or to signal to the conductor, or to reverse the engine or attempt to use the hand brake, which are *last resort actions* available when danger is apparent, confirm the view that the plaintiff through a brief lapse of consciousness, lost control of the train. Without such control and at the "tip-over" speed at which he was running the train, the attempt, whether conscious or automatic, that he made,—if he made one,—to apply the emergency

brake was futile, as the train was already out of control.

## III

### No Brake Failure

In their context, the plaintiff's narrations in their original version *are not* the imaginings of a person suffering from shock or amnesia, but the clear expositions of a person who is explaining *truthfully* the tragic happenings without adornment and without a desire to avoid responsibility by exculpating himself.

There is credible evidence that Parrish has had two more "blackouts" or *fugues* since the accident. Medical testimony has traced their cause to arteriosclerosis, anemia and under-nourishment, conditions from which Parrish has been suffering for some time and which have accelerated his aging process. As none has occurred before, except two occurring in childhood, which were of different origin, their occurrence could not be foreseen either by Parrish or by the Company. The *revised* version of the cause of the accident told by Parrish, set forth in his complaint, filed October 11, 1956, repeated at the trial, and which obliterates and covers with a mantle of forgetfulness the *original* version of the occurrence as given by him and shifts responsibility to faulty equipment *is not worthy of credence.* The more so, as I am convinced, not only by preponderance of evidence, but almost beyond doubt, from the record of the various investigations and experiments made, including that by the California Public Utilities Commission, that there *was no* brake failure or fault which caused the derailment. The results of these investigations and experiments and the physical exhibits offered to show the condition of the brakes in the lead car prove that the type of multiple and simultaneous breakages which could have caused the complete failure *now* blamed by Parrish and Smith for the derailment not only did not occur, but that, demonstrably, *it was impossible to occur.*

The automatic tape recorder of the lead car would indicate that there was no deceleration from the "in excess of" sixty-five mile speed. This evidences the fact that no attempt was made to apply the service brake, because the engineer, suffering from a momentary dissociation of personality, had lost control of the car and was under the illusion that the train was on an orange-lined country road thirty-five miles from where it actually was, instead of approaching the fifteen-mile curve.

As the fireman Smith was an experienced fireman-engineer, his failure to take over control, as required by company rules, when the engineer lost control of his train, evidences the fact that, despite his statement at the trial to the contrary, he did not realize or understand the cause of the engineer's difficulties. More, as will appear hereafter, in the circumstances, he *could have done nothing.*

The evidence in the record is that the maximum safe speed at which that curve could be taken is forty, or, at most, forty-five miles an hour. It was taken at a speed of in excess of sixty-five miles, *admittedly a "tip-over" speed,* and the attempt to apply the emergency brake, as shown by the presence of sand came too late, because the train was already uncontrollable and in the process of derailment.

To amplify: Before the train reached the point of derailment, it was tipping so that its right wheels were off the track altogether, and the left wheels were tipping so that only the outside edges could have been in contact with the rail. By the time the train had reached the motor car turn-off, it was tipping to such an extent that the inductor gouged into the wood. In the circumstances, it is obvious that the brakes, if applied, could not have functioned, and that, at such speed, there would be no further deceleration after the train tipped and before it began to slide along the ground.

The evidence in the record shows that the equipment was serviced regularly and the brakes tested before each trip. Indeed, both Parrish and Smith state positively that the brakes were put through all the usual tests before this

very run was begun and responded favorably.

There is some evidence of previous slight difficulties with the brakes. Each incident was explained as temporary, due either to (a) an employee's oversight, or (b) a minor mechanical misadjustment, easily remedied. But there is no credible evidence which shows any previous brake failure which would warrant either the abandonment of the use of brakes of this type as inadequate or unsafe, or be a warning to the defendant to exercise greater caution than it did in servicing them.

We conclude that there was no negligence or culpable failure of duty of the type which would impose liability on the defendant in this case.

IV

No Concession of Fault

 What precedes disposes of the main question involved. However, at the conclusion of the argument and in a memorandum filed afterwards on behalf of Parrish, an attempt is made to ground liability upon the basis of the negligent act of the fireman Smith *in failing* to take over the controls when he became aware that the engineer had lost control of the train.

I have already alluded to the fact that, in my view, Smith *did not realize* the gravity of the situation, i. e., that the

engineer, because of a *fugue,* had completely lost control of the train. *It being an occurrence which he could not anticipate, Smith is not at fault.* There is high authority for the view that, if the operator of a vehicle becomes unconscious, there is no liability to anyone for consequential injury. In Moore v. Capital Transit Co., 1955, 96 U.S.App. D.C. 335, 226 F.2d 57, the operator of a street car was stricken with a convulsive seizure which rendered him unconscious. A jury verdict against his employers, The Capital Transit Co., in favor of the operator of a taxi-cab and his wife, which the street car struck, was set aside by the trial court, and judgment in favor of the transit company *non obstante veredicto* was entered. The action was sustained by the Court of Appeals. So doing, the Court followed a previous decision of its own and State decisions to the effect that in such circumstances, the employer is not liable because neither he nor the employee could anticipate the sudden illness which

"renders it impossible for him to control the car." Cohen v. Petty, 1933, 62 App.D.C. 187, 65 F.2d 820, 821.

 So, whether we are dealing with an ordinary *automobile,*—as the situation was in the case just cited,—or with a *public vehicle,* such as a street car,—as in the former case,—responsibility of both operator and employer is denied.[1]

---

1. The principle declared in these cases finds approval in many cases decided by State courts. See Note 28 A.L.R.2d at pages 35 et seq. Among the cases in the group are two California cases in which the principle is approved, and Cohen v. Petty, supra, is specifically referred to. See, Waters v. Pacific Coast Dairy, Inc., 1942, 55 Cal.App.2d 789, 792, 131 P.2d 588; Ford v. Carew & English, 1948, 89 Cal.App.2d 199, 203, 200 P.2d 828.

In the first case, the Court, while approving the rule, held that it was not applicable to the facts in the case. In the second case, the principle was applied to hold harmless the employer of a hired limousine driver who lost control of his vehicle because of a sudden heart attack, and injured his passenger. In

sustaining a judgment for the defendant, the Court said:

"California has approved the rule of Cohen v. Petty, 62 App.D.C. 187, 65 F.2d 820, that as between an innocent passenger and innocent fainting driver, the former must suffer. [Waters v. Pacific Coast Dairy, Inc., 55 Cal.App.2d 789, 131 P.2d 588.] *The employer, even if a carrier, is not an insurer.* Liability is predicated upon negligence. While a strong argument can be made against the policy of the rule, if the liability of carriers is to be increased to that of an insurer in such cases, such increased liability should be imposed by the Legislature. In the absence of statute, such liability can only exist where there is negligence." (Emphasis added.) [200 P.2d 830]

And Smith would under this theory, and on the assumption of the inevitability of the accident by reason of Parrish's *fugue* and the impossibility and futility of any attempted control on his part, *be faultless*. So Parrish cannot recover because of any alleged negligent act on the part of Smith. *For there was, and could be, none.* Nor can Parrish derive any comfort from the defendant's admission of liability as to two plaintiffs in other cases which were consolidated with this case for trial. Such admission *is not a concession of fault on its part* and *does not* prevent it from contesting liability in the case before us. Ever since the beginning of reform procedure, a defendant has been allowed to plead inconsistent defenses (41 Am.Jur., Pleading, §§ 162–163). Rule 8(e)(2) of the Federal Rules of Civil Procedure, 28 U.S.C.A., specifically states that a party may state

> *"as many separate claims or defenses as he has regardless of consistency and whether based on legal or on equitable grounds or on both."* (Emphasis added.)

This is but a recognition of the federal practice obtaining before the enactment of the rules. Indeed, the Supreme Court stated in a patent case arising before the adoption of the Federal Rules of Civil Procedure:

> *"Alternative and inconsistent defenses may be pleaded."* Electric Storage Battery Co. v. Shimadzu, 1939, 307 U.S. 5, 15, 59 S.Ct. 675, 682, 83 L.Ed. 1071. (Emphasis added.)

It is true that admissions made in pleadings in a case based upon an identical occurrence may be introduced when a *contrary claim* is made in another action. 20 Am.Jur., Evidence, §§ 630–633. But the utmost benefit anyone can derive from such an admission is to point to it as an inconsistency (Jones v. Tierney-Sinclair, 1945, 71 Cal.App.2d 366, 373–374, 162 P.2d 669; Meyer v. State Board of Equalization, 1954, 42 Cal.2d 376, 385, 267 P.2d 257; 41 Am.

Jur., Pleading, §§ 200–203) which leaves it to the trial court to determine what, *if any*, effect is to be given to it as a contradiction. For "the law which permits a defendant to rely upon inconsistent defenses *precludes their being used against him by way of admission."* Sloan v. Stearns, 1955, 137 Cal.App.2d 289, 304, 290 P.2d 382, 392. (Emphasis added.) In the case before us, the defendant has, for reasons best known to itself, admitted liability as to Mrs. Catherine M. Parrish, the plaintiff's wife, who is the plaintiff in a separate action, and was a passenger on the train and as to another passenger, Helen Regets, the plaintiff in another action. When the problem of trying the cases together before a jury was discussed informally, and it was disclosed that, at least as to the plaintiff Helen Regets, liability might be admitted, the writer pointed out to all counsel the difficulty which the problem might present to a jury, if different theories of liability or defense were presented as to four different plaintiffs even if the cases were submitted on special interrogatories under Rule 49(b), Federal Rules of Civil Procedure. A jury was waived in order *to avoid* possible confusion of theories of liability or defense.

The position *now taken* by the plaintiff that he is entitled to the benefit of the admission of liability as to other plaintiffs in the consolidated cases is legally untenable, and, in the circumstances, equitably indefensible. A defendant should not be penalized for agreeing to the consolidated trial of cases which involve different theories of defense, in view of the broad scope of the rule, both state and federal, which allows *inconsistent* defenses to be presented, *even in the same action.*

As it is, the Court is of the view that the defendant has not jeoparded its position by any admission, either in the pleadings or in open court.

Judgment will be for the defendant.