Peter J. ZEGAN

v.

The CENTRAL RAILROAD COMPANY
OF NEW JERSEY.

Civ. A. No. 20456.

United States District Court
E. D. Pennsylvania.

July 9, 1958.

Milford J. Meyer, Philadelphia, Pa., for plaintiff.

Richard P. Brown, Jr., Philadelphia, Pa., for defendant.

VAN DUSEN, District Judge.

This case is before the court on post-trial motions [1] following a jury's verdict [2] for the plaintiff in a suit under the Federal Employers' Liability Act for alleged injuries of plaintiff claimed to have resulted from riveting the center rung on the end step of a baggage car. The evidence, based on the testimony of the plaintiff and his witnesses, was as follows:

The plaintiff became an employee of the defendant company in 1928 and, except for one three-month period, has not worked for anyone else between that time and the time of the alleged accident in February 1954.[2a] He first served an apprenticeship preparatory to qualifying as a passenger-car repairman, the normal four-year apprenticeship taking him ten years to complete because of furloughs (N. T. 73). During apprenticeship, the apprentices are placed at various jobs in order that they may learn all the job facets of the position of car repairman (N. T. 29, 73).

Riveting was part of the job of a car repairman (N. T. 30). Mr. Zegan received no training in riveting during his apprenticeship (N. T. 30), nor did he do any riveting during that time (N. T. 74), but he does not know of any specific requirement that one had to qualify as a riveter during apprenticeship (N. T. 87).

After the plaintiff had qualified as a passenger-car repairman in 1938 (N. T. 73), he had riveted with a gun taking ⅜″ to ½″ rivets.

On February 25, 1954, a baggage car was in the repair shop. The previous day it had been taken off its trucks and placed on benches, but on the morning of February 25 it was returned to the trucks. (N. T. 31, 313, 314). When on benches, the end sill of the car is 54½″ from the ground and the center rung of the end step is 44″ above ground. When the car is on its trucks, both the end sill and the center rung of the end step are about 10″ closer to the ground (N. T. 44, 45, 109). Some riveting had to be done on the end step of this car and on other cars in the shop. At one part of his testimony, plaintiff's witness, Walter Hurley, who was identified as the man who did

---

1. Plaintiff has filed a motion to amend judgment (Document No. 25 in the Clerk's file). Defendant has filed a motion for new trial (Document No. 23 in the Clerk's file) and a motion to have verdict and judgment in favor of plaintiff set aside and for entry of judgment for defendant (Document No. 24 in Clerk's file).

2. The special verdict of the jury was as follows:

"1. Was the defendant, Central Railroad Company of New Jersey, its employees or agents (other than Peter J. Zegan), negligent and did this negligence contribute, in whole or in part, to the injuries?

"Yes or No   Yes

"If your answer to this question is 'no,' do not answer the questions listed below. If your answer to this question is 'yes,' answer the questions listed below.

"2. What were the damages suffered by plaintiff, Peter J. Zegan?

"$70,000.00

"[(a) Medical expenses ($1,635.0.)), (b) loss of earnings to date of trial ($5,388.56 plus $2,091.72 furlough time, if any, or part of these sums), (c) loss of future earnings reduced to present worth, (d) damages for pain, suffering, injury and inconvenience.]

"3. Was the plaintiff, Peter J. Zegan, negligent and did this negligence contribute to the injuries?

"Yes or No   Yes

"If the answer to this question is 'no,' do not answer No. 4.

"4. If your answer to question 3 is 'yes,' what proportion of the negligence was attributable to the plaintiff, Peter J. Zegan?  50%"

2a. N. T. 29. The record may not disclose his employers during all furlough periods.

most of the riveting, stated that the type of riveting involved was usually done while the car was up on the benches and only done on the trucks when there was an emergency (N. T. 445).[3] However, in later describing how he did the work when the car was down on the trucks, he stated twice, "I generally use a block" (N. T. 457). By using the term "generally," he indicated that at other times when the car was on the trucks he used another position to rivet. This testimony of plaintiff's witness indicates that this work was done while the car was down on the trucks more times than could be correctly described as "emergency" situations.

The job on the baggage car in question required use of a slightly heavier rivet gun than the one plaintiff had previously employed. This heavier gun weighed 17 to 25 pounds with the plunger and die attached. Weight was the only difference between the two guns.

There was no assigned riveter in the shop who did nothing but riveting (N. T. 90), but a fellow car-repairman (Hurley) did the riveting if any was to be done when he was on the job. In Mr. Hurley's opinion, if the riveting were done when the car was up on the benches, it would be more convenient (N. T. 447).[4]

In the afternoon of February 25, 1954, the foreman instructed the plaintiff to do some riveting of ⅜″ rivets on another passenger car step and also to rivet the car step of the baggage car mentioned above (N. T. 80, 81). After driving the ⅜″ rivets with the smaller rivet gun, the plaintiff put the bigger rivet gun on the hose, and proceeded with the riveting job on the car in question (N. T. 80). At the time he was instructed to do the riveting work, the plaintiff made no complaint about the job he was to do, the position of the car, or the weight of the gun (N. T. 132, 133; Stangel—307–8).

The plaintiff was not instructed to rivet the end step onto the baggage car but only to rivet the center rung into the step framework (N. T. 100), a job which required insertion of the side rivets and the center rivet (N. T. 100). The plaintiff had previous experience in putting a step on and had also seen the underside rivet put on this center rung, both from underneath the car or from outside the car (N. T. 40, 111).

Mr. Zegan felt it was safer for him to get underneath the car in order to rivet the center rivet (N. T. 112), but does not feel qualified to express an opinion as to which is the safe way to rivet on that center step (N. T. 129).

The plaintiff's position while underneath the car riveting the center rung was a crouched or squatted position, with one leg higher than the other, his back up, and his hind quarters resting on one of his feet (N. T. 119, 120). If the car had been up on the benches, the position of the plaintiff would have been the same, except that his knees would not have been bent to as great an extent as they were (N. T. 126). The plaintiff did not place his elbow on his knee, and said this was not feasible as his knee was out in front of him and not close to his elbow (N. T. 140). Although the plaintiff claimed he took the position of the "regular riveter" (N. T. 41), the man whom he described as such (Walter Hurley) testified, as plaintiff's witness, that he does not assume the position described by Mr. Zegan. When riveting with the car on the trucks, Hurley sits on a block and when riveting with the car on the benches, he puts one foot on a small bench and the gun on his knees (N. T. 457, 458) and bends over to do the job. He states also that he has to bend to some degree, whether the car is on the benches or on the trucks (N. T. 461).

While the plaintiff was underneath the car in the position described above, at a

---

3. There was also testimony by defendant's witnesses that it was not customary to place the car on benches just to put the step on (N. T. 304) and that the work was done equally while the car was up on the benches and on the trucks (N. T. 277).

4. However, Mr. Hurley's testimony also indicates that he did the work in both positions (N. T. 457).

time when he was about finished riveting, he suddenly encountered pain in the small of his back. He finished the rivet, then crawled out from under the car, holding his back (N. T. 43). Mr. Zegan, who had incurred a back strain in 1939 which incapacitated him for a month or two (N. T. 45, 46), told the foreman he thought he "had a cold in the back" (N. T. 44).[5] He finished the day's work, which only involved putting tools away (N. T. 44). He complained again about his back the next day (a Friday), did no work that day ( N. T. 47) [6] and did not do any work after that date for a long period of time. He was told only to do light work after a period of complete incapacity.

Dr. Lefkce, who testified in person for the plaintiff, saw him only twice, the first time being two years after the accident and the second time during the trial. His diagnosis as of the trial date was contracture of the left hamstring musculature and persistent irritation of the lower lumbar nerve roots. His own examination did not show how long the condition had existed (N. T. 183) but, according to what Mr. Zegan told him, he stated his condition was a result of the 1954 injury (N. T. 183).

When he first examined Mr. Zegan, he found contracture of the hamstring muscles which he believed came from a nerve root irritation (N. T. 184). Such irritation can come from many causes (N. T. 186). He also concluded that there had been a protrusion of the disc which had receded and gone back into place (N. T. 186). This type of protrusion could be caused by various things, including degeneration from age, sudden extreme injuries, extremely heavy lifting, or being forced into an abnormal position very suddenly (N. T. 187). The doctor stated that the protrusion would probably not come from a person squatting on his haunches (N. T. 188) and that if he were squatting with his back straight, the strain on his back would be no greater than if he were standing erect (N. T. 191). If he were bending forward at the time, the doctor believes the position would be easier than if he were in an erect or hyper-extended position (N. T. 191). In his 1957 examination of the plaintiff, no evidence of disc damage was found. If there was any damage, it occurred in 1954, returned to normal, and then flared up again when he had his flare-up in 1957 (N. T. 193). He believed something must have happened in 1957 as well as in 1954.

Depositions of Carlo Sorrell, M. D., taken by plaintiff, were also read into evidence. Dr. Sorrell first saw the patient more than a year after February 24, 1954 (N. T. 231) and has treated him subsequent to that time. His only basis for knowing when the condition from which Mr. Zegan was suffering when he saw him first in April 1955 commenced was the history of the case as given by Mr. Zegan (N. T. 243). Mr. Zegan told him at that time that while at work on February 25, 1954, using a rivet gun in a stooped position, he exerted pressure to keep the gun up and developed pain in the lower back (N. T. 242). The condition found in April 1955 could have started from twisting, heavy weight lifting, falling, or even from bending to tie a shoe lace if there was some pre-existing pathology (N. T. 244). Mr. Zegan had a history of a normal back, but he had had a sprained back in 1939 from which he had recovered. X-rays also showed arth-

5. Evidence produced by defendant strongly contradicts this testimony: N. T. pp. 275, 276, 277, 308, 310, 311, 393. Mr. Zegan admitted that he told the claim department of defendant company that he did not mention the experience to anyone but stated that he meant he did not tell anyone of an *injury* because he thought it was just a cold (N. T. 410). This would brand as incorrect his statement that he told the foreman he thought he "hurt the back" (N. T. 44), as would his statement, also on p. 44 of the Notes of Testimony, that he did not think he had an injury at the time.

6. Evidence of defendant contradicts this testimony (N. T. 276, 310), as does plaintiff's statement in an injury report (D–4), part of which is quoted at pp. 393–4 of the Notes of Testimony.

ritis of the back (N. T. 245). In May 1957, there was a question of a slipped disc (N. T. 245) and there is a possible defect in the nerve root at L5 and S1 level (N. T. 253). Dr. Sorrell's testimony does not concern the question of causation except as mentioned above.

■ This claim is brought under the Federal Employers' Liability Act.[7] The Act imposes liability on an employer only if he is negligent [8] and if said negligence contributed to the injury suffered.[9]

■ No case based on the F. E. L. A. should be submitted to a jury until the plaintiff has met his burden of producing probative facts from which reasonable men could infer both negligence and that such negligence played some part in the injury.[10] In the instant case, plaintiff failed to meet this burden. There was no evidence from which could be inferred any causal relationship between his injury and any alleged negligence on the part of the defendant railroad.[11]

7. 45 U.S.C.A. § 51 et seq. (hereinafter referred to as "F. E. L. A.").

8. Negligence under the F. E. L. A. has been defined as "The lack of due care under the circumstances; or the failure to do what a reasonable and prudent man would ordinarily have done under the circumstances of the situation; or doing what such a person under the existing circumstances would not have done." Tiller v. Atlantic Coast Line R. Co., 1943, 318 U.S. 54, 67, 63 S.Ct. 444, 451, 87 L.Ed. 610; Keith v. Wheeling & L. E. Ry. Co., 6 Cir., 1947, 160 F.2d 654, 657; Sheaf v. Minneapolis, St. P. & S. S. M. R. Co., 8 Cir., 1947, 162 F.2d 110.

9. "The Act does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur. And that negligence must be 'in whole or in part' the cause of the injury." Ellis v. Union Pacific Railroad Co., 1947, 329 U.S. 649, 653, 67 S.Ct. 598, 600, 91 L.Ed. 572.

10. Dessi v. Pennsylvania R. Co., 3 Cir., 1957, 251 F.2d 149, certiorari denied 78 S.Ct. 1006. Mere speculation does not substitute for probative facts. Tennant v. Peoria & P. U. Ry. Co., 1944, 321 U.S. 29, 32, 64 S.Ct. 409, 88 L.Ed. 520. If only a scintilla of evidence is produced by the plaintiff in support of his claim, the case is not a proper one for the jury. Brady v. Southern Ry. Co., 1943, 320 U.S. 476, 479, 64 S.Ct. 232, 88 L.Ed. 239; Wadiak v. Illinois Cent. R. Co., 7 Cir., 1953, 208 F.2d 925.

11. This conclusion makes it unnecessary for the court to determine whether sufficient evidence was produced on the issue of negligence to constitute a jury question. However, plaintiff's evidence on the issue of negligence was also scant. Riveting was part of the job of car repairman. Mr. Zegan had been a car repairman for many years. It seems unlikely that reasonable men could hold that his foreman was negligent in ordering him to rivet the car step. The fact that Mr. Zegan had never used the particular weight rivet gun necessary to rivet the step was not made known to the foreman. It appears unreasonable that the defendant should be held to be aware of this fact. The only probative evidence permitting any inference that the step, in the position in which it was, was an unsafe place to work was a statement of opinion that if the car was higher (on the benches), it would be more convenient and both men would be safe (N. T. 447). No other facts are presented to support this allegation. The following cases support the proposition that the evidence on the issue of negligence was so slight that the jury should not have been permitted to consider the question of negligence: Moore v. Chesapeake & O. R. Co., 1951, 340 U.S. 573, 71 S.Ct. 428, 95 L.Ed. 547; Brady v. Southern R. Co., 1943, 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239; Eckenrode v. Pennsylvania R. Co., 3 Cir., 1947, 164 F.2d 996, affirmed 1948, 335 U.S. 329, 69 S.Ct. 91, 93 L.Ed. 41. See, also, Restatement, Torts, § 289, including Comment b thereof, § 291, including Comments a and b thereof, and § 293. Cf. McIntyre v. Central R. of N. J., 3 Cir., 1958, 251 F.2d 158, 159-160, but cf. Ringhiser v. Chesapeake & O. R. Co., 1957, 354 U.S. 901, 77 S.Ct. 1093, 1 L. Ed.2d 1268. This opinion is consistent with, and independent of, an assumption that the jury could properly find the defendant negligent, including negligence in failing to use reasonable care to provide a safe place to work because the car was on the trucks rather than on the benches. However, as pointed out above, there is no evidence to justify a finding that any such negligence contributed in the slightest part to the injury.

The allegations of negligence were that the plaintiff was required to perform a job he had not been trained to do, with an unfamiliar instrument in an unsafe place. The record does not contain more than a scintilla of evidence that any of the above contributed in any way to the injury.[12]

The rivet gun which the plaintiff was required to use was heavier and more powerful than any rivet gun he had ever previously used. If the tool had been too heavy for him or if the power of the gun had surprised him and contributed to his injury, a connection between the alleged negligence and the injury could possibly be found. However, the record shows that the plaintiff was used to using heavy tools (N. T. 82, 83) and is devoid of any testimony that the weight or power of the gun bore any relationship to the injury.

Plaintiff offered no evidence to show that the fact that the baggage car was lower than its level when on the benches contributed to the injury. In describing the accident, Mr. Zegan merely stated that he was riveting from a squatted position with his back up (N. T. 119, 120) when he suddenly encountered pain in his back (N. T. 43). He stated that if the baggage car had been up on the benches, he would have assumed the same position, except that his knees would not have been bent as much (N. T. 126). Dr. Lefkoe, testifying for the plaintiff, stated that the position assumed was no greater a strain on his back than if he were standing erect (N. T. 191). Although Mr. Zegan stated his back was erect, the witness he offered as an expert on riveting stated that some bending was needed in order to rivet the part of the end step involved (N. T. 461). If Mr. Zegan were bending forward at the time, Dr. Lefkoe believes that the position would be easier on his back than if he were in an erect or hyper-extended position (N. T. 191).

The plaintiff's testimony produced no evidence from which a jury could reasonably infer that any connection existed between his injury and the fact that he had never been given instructions as to what position to assume when riveting at this particular place on a baggage car. The position he assumed was no greater a strain on his back than if he had been standing erect. This being so, he cannot complain that his back was injured because he assumed a position which, in fact, contributed in some part to his injury.[13]

■■ This plaintiff has only shown that he had an accident which resulted in an injury. This is insufficient under the F. E. L. A. to impose liability on the defendant.[14] There is an absence of evidence, circumstantial or direct, tending to show that the negligence of the defendant contributed in any part to plaintiff's injury. Without such evidence, entry of judgment n. o. v. is required.[15]

In view of the foregoing disposition of defendant's motion for the entry of judgment notwithstanding the verdict, there is no need to rule on defendant's motion for a new trial at this time. If the United States Court of Appeals reverses

12. Plaintiff's brief and reply brief, filed May 5, 1958 (as well as defendant's two briefs), have been placed in the Clerk's file to show the positions of counsel on the post-trial motions.

13. Since the plaintiff had suffered from a prior back injury in 1939, bending to tie his shoe lace might even have caused the alleged disc injury under the plaintiff's own medical evidence (N. T. 244-5). The alleged expert riveter called by plaintiff (Mr. Hurley) did not specify any particular way of placing one's back in doing this job.

14. Cf. Burch v. Reading Co., 3 Cir., 1957, 240 F.2d 574, 580, certiorari denied 1957, 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914, where the court stated that under the F. E. L. A. there is no liability on the part of an employer for injuries suffered by an employee as a result of a pure accident occurring while working in a reasonably safe place.

15. Dessi v. Pennsylvania R. Co., 3 Cir., 1958, 251 F.2d 149, certiorari denied 78 S.Ct. 1006; Gill v. Pennsylvania R. Co., 3 Cir., 1953, 201 F.2d 718.

the judgment entered for defendant, the motion for new trial will be granted,[16] since the foregoing discussion shows that the verdict is, at the least, against the weight of the evidence. See Magee v. General Motors Corp., 3 Cir., 1954, 213 F.2d 899; Aetna Casualty & Surety Co. v. Yeatts, 4 Cir., 1941, 122 F.2d 350, 352, 354; Garrison v. United States, 4 Cir., 1932, 62 F.2d 41, 52.[17]

16. Peters v. Smith, 3 Cir., 1955, 221 F.2d 721, 725.

17. This reason makes it unecessary to pass on defendant's other reasons for new trial, such as the effect of court's answer to the jury's question on the size of the verdict.