BRADY, ADMINISTRATRIX, *v.* SOUTHERN RAIL-
WAY CO.

No. 26.   Argued October 19, 1943.—Decided December 20, 1943.

*Messrs. Welch Jordan* and *D. E. Hudgins,* with whom *Messrs Julius C. Smith* and *C. Clifford Frazier* were on the brief, for petitioner.

*Mr. Sidney S. Alderman,* with whom *Messrs. Russell M. Robinson, S. R. Prince, H. G. Hedrick,* and *W. T. Joyner* were on the brief, for respondent.

MR. JUSTICE REED delivered the opinion of the Court.

This case arose under the Federal Employers' Liability Act.[1] Certiorari to the Supreme Court of North Carolina was sought and granted to consider the retroactivity of the last amendment to the Act in conjunction with the contention that there was error in the ruling which held the case improperly submitted to the jury by the trial court. 319 U. S. 777. Our conclusion makes it unnecessary to consider the former problem.

The decedent, Earle A. Brady, was a brakeman. At the time of his death he was employed in that capacity in interstate commerce by the respondent, Southern Railway Company. The accident occurred during a switching movement in Virginia. The freight train upon which decedent was acting as brakeman came north over a main line and passed a switch which led into a storage track running south parallel to and on the east of the main line. There were four other members of the crew—the engineer, the fireman, the flagman and the conductor.

After the entire train passed the switch, it was stopped and backed into the storage track to permit another northbound train to go through on the main line and to pick up twelve cars at the south end of the storage track. After the other train passed, decedent's train, without picking up the storage track cars, pulled out on to the main line, backed southwardly beyond a vehicular grade cross-

---

[1] 35 Stat. 65, as amended; 36 Stat. 291; and 53 Stat. 1404.

ing which passed over the main line and the storage track about one-eighth of a mile south of the switchpoints, left the caboose and all the cars except the four nearest the engine on the main line and returned north for the purpose of again backing into the storage track to pick up the storage track cars. After coupling these cars on to the four next to the engine, the intended movement was to pull out again on the main line, back the train southwardly to the cars left on the main line, couple up all the cars and proceed on the journey to the north.

As the engine and four cars backed slowly into the storage track, the decedent was riding the southeastern step of the rear car, a gondola. It was 6:30 A. M. on Christmas morning and so dark the work was carried on by lantern signals. The trucks hit the wrong end of a derailer, located three or four car lengths from the switch, which was closed so as to prevent cars on the storage track from drifting accidentally onto the main line.[2] The contact derailed the cars and threw decedent to instant death under the wheels.

Damages were sought for the alleged negligence of the carrier in failing to furnish a reasonably safe place to work by reason of defects in the track and derailer and, we assume since it was submitted to the jury and passed upon by the Supreme Court of North Carolina, 222 N. C. at 370, 23 S. E. 2d 334, 337, by the act of some other employee in improperly closing the derailer after the beginning and

---

[2] A derailer is a small but heavy iron device attached to a rail which opens and closes over the rail by a lever, so as to derail or turn off the track cars approaching the closed derailer from the expected direction. When the derailer is open trains may pass in either direction without interference. A train or car approaching a closed derailer from the unexpected or wrong direction may successfully roll over the obstruction but more probably they, too, would be derailed. The apparatus is not designed when closed to safely permit the passage of cars from the unexpected direction.

before the fatal phase of the switching movement. Further there was a charge of negligence in failing to provide a light or other warning to indicate the dangerous position of the derailer. A judgment for $20,000 was obtained in the Superior Court which was reversed in the state Supreme Court on the ground of the failure of the evidence to support the jury's verdict.

There is thus presented the problem of whether sufficient evidence of negligence is furnished by the record to justify the submission of the case to the jury. In Employers' Liability cases, this question must be determined by this Court finally. Through the supremacy clause of the Constitution, Art. VI, we are charged with assuring the act's authority in state courts. Only by a uniform federal rule as to the necessary amount of evidence may litigants under the federal act receive similar treatment in all states. *Western & Atlantic R. Co.* v. *Hughes,* 278 U. S. 496, 498; *Chicago, M. & St. P. Ry. Co.* v. *Coogan,* 271 U. S. 472, 474. Cf. *United Gas Co.* v. *Texas,* 303 U. S. 123, 143. It is true that this Court has held that a state need not provide in F. E. L. A. cases any trial by jury according to the requirements of the Seventh Amendment. *Minneapolis & St. Louis R. Co.* v. *Bombolis,* 241 U. S. 211. But when a state's jury system requires the court to determine the sufficiency of the evidence to support a finding of a federal right to recover, the correctness of its ruling is a federal question. The weight of the evidence under the Employers' Liability Act must be more than a scintilla before the case may be properly left to the discretion of the trier of fact—in this case, the jury. *Western & Atlantic R. Co.* v. *Hughes, supra; Baltimore & Ohio R. Co.* v. *Groeger,* 266 U. S. 521, 524. Cf. *Gunning* v. *Cooley,* 281 U. S. 90, 94; *Commissioners* v. *Clark,* 94 U. S. 278, 284. When the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict, the court should determine the proceed-

ing by non-suit, directed verdict or otherwise in accordance with the applicable practice without submission to the jury, or by judgment notwithstanding the verdict. By such direction of the trial the result is saved from the mischance of speculation over legally unfounded claims. *Galloway* v. *United States,* 319 U. S. 372; *Pence* v. *United States,* 316 U. S. 332; *Baltimore & Ohio R. Co.* v. *Groeger,* 266 U. S. 521, n. 1; *Anderson* v. *Smith,* 226 U. S. 439; *Coughran* v. *Bigelow,* 164 U. S. 301, 307; *Gunning* v. *Cooley,* 281 U. S. 90, 93, note; *Seaboard Air Line* v. *Padgett,* 236 U. S. 668, 673; *Parks* v. *Ross,* 11 How. 362, 373. See IX Wigmore on Evidence (3d ed., 1940), §§ 2494 *et seq.*

An examination of the proven facts to determine whether they are sufficient to permit a verdict by the jury for the decedent's estate based upon reason is of no doctrinal importance. Every case varies. However, the soundness of the judgment entered in the state Supreme Court depends upon an appraisal of the evidence and, as to this, there is a difference of opinion here. Our conclusion is that there is failure to show in the record any negligence of the carrier from not putting a light on the derailer or by the action of other employees than decedent in closing the derailer.

As to the light, it is nowhere shown that it was customary or even desirable in the operation of this or any other railroad to equip derailers with such a signal. Apparently lights on a derailer are not used on storage tracks where, as at the place of the accident, an automatic block system functions.

Nor do we find any evidence upon which a jury could find negligence of other employees of the carrier in setting the derailer without warning the decedent. On the first backward movement into the storage track, the engineer and fireman were in the engine cab at the front of the train. There is no evidence that either left that posi-

tion until after the accident. As the entire train passed the derailer then without incident and again upon its exit from the storage track to return to the main line to cut the train, there is no suggestion that the derailer was not open during that part of the movement. As petitioner states, "during switching operations it is the usual rule and custom for the derailer to be kept off the track until the switching operation is completed." This time the switch was closed between the movement just referred to and the return of the engine and four cars to the storage track to pick up the cars waiting transportation.

The evidence shows without contrary intimation that on the first movement into the storage track the twelve cars to be picked up later were south of the crossing and therefore more than an eighth of a mile from the switch. "When the cars or the train was backed into the pass track to let the northbound train pass, I [the conductor] threw the switch and the derailer and then came back to the crossing to await the other movement—to keep from hitting an automobile." "When that movement was made—when they backed out on the main line—I was at this crossing, protecting the crossing. In the backing up movement I protected the crossing and then they cut out the four cars. The engine came over the crossing; cut off somewhere five or six cars south of the crossing. I was not up north of the engine when they cut the cars out. I was back up here. I rode the caboose car back. When they came on down I stayed on the caboose car and Mr. Brady stayed where the four or five cars were. He cut those out. I didn't see him. I was checking on those cars. I had left the caboose. I was not far from those twelve cars so I left the caboose to check up on the cars. While I was over there I heard the blast of the locomotive engine. I didn't see how the cars were derailed—left the track—nor did I see where Mr. Brady was at that time." Obviously the conductor, in order to get near the twelve stored cars,

hopped the caboose at the crossing as it backed up on the main line. The flagman testified that the conductor came back and watched the crossing after the train first backed into the storage track. The flagman also testified that on leaving the caboose after the second train passed he, the flagman, went south to check up on the twelve stored cars and never touched either the switch or the derailer.

The undisputed testimony as to the significant movements of the decedent, Brady, as given by the engineer, follows:

"When we backed into the pass or storage track the first time and got in there to wait for No. 30 to go by, I saw Mr. Brady close the switch and the derailer. Mr. Brady gave me the signal to come back out. He set the derailer not to derail and opened the switch for me to come out and I came on out. Then I pulled out and back down south on the northbound track beyond the crossing. Mr. Brady was on the four cars and I saw him get off these four cars. He rode back north on these four cars 'til he got north of the switch. He got off the car and throwed the switch and got back and signaled me back. From the time I came out of the switch until I came back in there I never seen anybody else in there, other than Mr. Brady."

With the record evidence as to the action of the crew in this condition, it appears obvious that there is nothing to show negligence by any of the other servants of the carrier.

We now turn to the third instance of alleged negligence. This is the existence to the knowledge of the carrier of a rail, opposite the derailer, so worn on top and sides that in the opinion of qualified experts it permitted the thrust of the east wheels of the car, as they rose over the "wrong end" of the derailer, to force the flange on the west wheels over the defective rail and so to derail the cars, when no such derailment would have occurred, "nine times out of

ten, if the best type" rail was in use. There is no evidence of the unsuitability of the rail for ordinary use.

Such evidence, we assume, would justify a finding for petitioners, if the defective rail was the proximate cause of the derailment and the backing of the train improperly over the closed derailer a danger reasonably to be anticipated. As to the likelihood of cars passing over the wrong end of derailers, one witness with ten years' experience as a brakeman testified that he recalled three or four instances. Another, the Superintendent of the railroad with 22 years' experience said, "It happens very frequently. I would say yes, I have seen it 25 to 50 times." The rule as to when a directed verdict is proper, heretofore referred to, is applicable to questions of proximate cause. *Atchison, T. & S. F. Ry. Co.* v. *Toops,* 281 U. S. 351; *St. Louis-San Francisco Ry. Co.* v. *Mills,* 271 U. S. 344, 348; *New York Central R. Co.* v. *Ambrose,* 280 U. S. 486; *Baltimore & Ohio R. Co.* v. *Tindall,* 47 F. 2d 19; *Texas Gulf Sulphur Co.* v. *Portland Gas Light Co.,* 57 F. 2d 801. Cf. *Story Parchment Co.* v. *Paterson Co.,* 282 U. S. 555, 566.

The Supreme Court of North Carolina was of the view that striking a derailer from the unexpected direction "was so unusual, so contrary to the purpose" of the derailer that provision to guard against such a happening was beyond the requirement of due care. With this we agree. Bare possibility is not sufficient. *Milwaukee & St. Paul Ry. Co.* v. *Kellogg,* 94 U. S. 469, at 475:

"But it is generally held, that, in order to warrant a finding that negligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances."

Events too remote to require reasonable prevision need not be anticipated. It was so held as to an intervening

embargo after a delay in transit which was caused by negligence. *The Malcolm Baxter,* 277 U. S. 323, 334. Cf. *Northern Ry. Co.* v. *Page,* 274 U. S. 65, 74; *St. Louis-San Francisco Ry. Co.* v. *Mills, supra.* Liability arises from negligence not from injury under this Act. And that negligence must be the cause of the injury. *Tiller* v. *Atlantic Coast Line R. Co.,* 318 U. S. 54, 67. Here the rail was sufficient for ordinary use, and the carrier was not obliged to foresee and guard against misuse of the derailer, even though the misuse occurred as often as the evidence indicated. It was the wrongful use of the derailer that immediately occasioned the harm. Decedent had first closed and then opened the derailer on the first movement. He signalled the train to back into the storage track just before the fatal accident. Although this misuse of the derailer was an act of negligence, it is mere speculation as to whether that negligence is chargeable to the decedent or another. Without this unexpected occurrence, the adequacy of the rail vis-à-vis a properly used derailer is unquestioned. It was entirely disconnected from the earlier act of the carrier in placing the weak rail in the track. The mere fact that with a sound rail the accident might not have happened is not enough. The carrier's negligence must be a link in an unbroken chain of reasonably foreseeable events.[3]

*Affirmed.*

MR. JUSTICE BLACK, dissenting:

Twelve North Carolina citizens who heard many witnesses and saw many exhibits found on their oaths that the railroad's employees were negligent. The local trial judge sustained their finding. Four members of this Court agree with the local trial judge that the jury's conclusion was reasonable. Nevertheless five members of the Court

---

[3] See e. g., *The Squib Case,* 2 W. Bl. 892. Cf. 1 Cooley on Torts (4th Ed., 1932) § 50, n. 25, and collection of cases.

purport to weigh all the evidence offered by both parties to the suit, and hold the conclusion was unreasonable. Truly, appellate review of jury verdicts by application of a supposed norm of reasonableness gives rise to puzzling results.[1]

Although I do not agree that the "uniform federal rule" on directed verdicts announced by the Court correctly states the law, I place my dissent on the ground that, whatever rule be applied, petitioner sufficiently alleged and proved at least two separate acts of negligence attributable to the respondent railroad but for which the decedent Brady would probably have escaped death. The first was the act of one of respondent's trainmen in negligently closing the derailer; the second, the act of respondent's maintenance crew in negligently keeping a defective rail opposite that derailer. Proof of either was sufficient in itself to support a jury verdict against respondent under the terms of the Federal Employers' Liability Act.[2]

---

[1] For an enlightening exposition of the uncertainties generated by excessive judicial use of the norm of reasonableness, see Jackson, Trial Practice in Accident Litigation (1930), 15 Cornell Law Quarterly, 194 et seq. It was the writer's opinion that there was "a persistent, insidious, and plausible tendency toward uncertainty in everything that legal reasoning touches," and that this tendency was "easier to illustrate than to describe." Had today's decision then been available, it could well have been added to the several decisions which were used as illustrations. Likewise the criticism which the writer directed at these illustrative decisions is exactly applicable to what the Court today, by applying a legal doctrine misnamed "proximate cause," has done to the Federal Employers' Liability Act. For what it has done is to choose "between two lines of public policy. It could not think in the simple terms of the statutory command; it reverted to the complex legal reasoning involving a combination of principles and depending upon multiplied conditions which the statute tried to supersede."

[2] "Every common carrier by railroad while engaging in commerce between any of the several States or Territories . . . shall be liable in damages to any person suffering injury while he is employed by such

486

*Negligence in closing derailer.* A contributing cause to decedent's death was that the derailer was in a closed position at the time the engineer backed the engine and four cars into it. That the derailer should have been open is not disputed. The evidence was sufficient to show that the employee who negligently closed the derailer must have been either the flagman, the conductor, or the decedent. The flagman expressly denied that he closed the derailer, but the conductor made no such denial. Petitioner, although deprived of decedent's testimony, did produce evidence from which the jury could find that it was not decedent who closed it. Testimony established that decedent knew of the existence and location of the derailer, that he was an experienced brakeman, and that he would be aware of the danger of riding a freight car over a closed derailer. From these facts the jury could find that decedent thought the derailer was open since he would not likely have signalled the train over a closed derailer at the peril of his own safety and protection. Cf. *Atchison, T. & S. F. Ry. Co.* v. *Toops,* 281 U. S. 351, 356. A similar inference is not justified as regards the flagman and conductor for the evidence shows that at the time of the accident both were a half mile away and therefore were not imperiled by the decedent's signalling back the train and were not in a position to have prevented the signal.[3]

carrier in such commerce, or, in case of the death of such employee, to his or her personal representative . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, . . . or other equipment." 35 Stat. 65, as amended; 53 Stat. 1404; U. S. C., Title 45, § 51.

[3] Uncontradicted testimony showed that both the flagman and the conductor were under the duty to operate the derailer in switching operations when the train was long. Here the train was four hundred yards in length. The conductor admitted that he had operated the derailer once during the switching operation, and that he had been

Having thus brought forth evidence that one of respondent's employees negligently closed the derailer and that decedent was not that employee, petitioner had proved a case for the jury. I cannot agree with the view apparently adopted by the Court that the petitioner was required to pin the negligence on a particular one of decedent's fellow employees. No such burden is imposed by the Federal Act. It provides merely that a railroad is liable "for . . . death resulting in whole or *in part* from the negligence of *any* of the . . . employees." (Italics supplied.) [4]

*Negligence in keeping defective rail opposite derailer.* There was evidence to show that the rail of the pass track opposite the derailer had been used for twenty-six years; that the top of the rail was decayed, rusty, badly worn, and thin; that with bare fingers metal slivers could easily be picked from both sides of the rail; and that some of the cross ties were old, not properly supported by ballast, and sloped toward the defective rail. Petitioner then offered expert evidence, contradicted by respondent's expert evidence, that the derailment would not have occurred but for this defective rail. The Court declines to give any effect whatever to all of this evidence on two stated grounds: (1) That the rail was suitable for ordinary use and the backing of the train improperly over the closed derailer was not "a danger reasonably to have been anticipated"; (2) That the "weak rail" was not the "proximate cause" of the death.

It is difficult to imagine how, except by sheer guessing, or by drawing upon some undisclosed superior fund of wisdom, the Court reaches the conclusion that respondent

---

in a place where he could have closed it before the engine and four cars backed into it. Not one of the conductor's fellow employees testified as to what the conductor was doing at the time when the derailer must have been closed.

[4] See Note 2, *supra*.

need not have foreseen that trains would be backed over the wrong end of closed derailers. The evidence of railroad men who had worked on railroads showed it was foreseeable. Doubtless judges know more about formal logic and legal principles than do brakemen, engineers, and divisional superintendents. I am not so certain that they know more about the danger of keeping a defective rail immediately opposite a derailer. The Divisional Superintendent of the Southern Railway Company, put on the stand by the respondent, testified that trains backed over closed derailers "very frequently." He himself had seen it happen "on 25 to 50 occasions." And undisputed evidence, including photographs, showed that respondent had foreseen this likelihood to the extent that the top of the derailer had a special groove to hold the flange of a wheel as it passed over the back of the derailer. That a train would ordinarily not be backed over a closed derailer except for the personal negligence of the train crew is not determinative of the issue of foreseeability. The standard of reasonable conduct may require the defendant to protect the plaintiff against "that occasional negligence which is one of the ordinary incidents of human life and therefore to be anticipated. . . ."[5] And the mere fact that the negligence of the respondent in placing the weak rail in the track occurred several years before the accident does not establish that the subsequent injury was not foreseeable. The negligent conduct of respondent not only consisted of "placing the weak rail in the track"; it also consisted of keeping the "weak rail" there.

Nor is it easy to comprehend why the defective rail was not the "proximate cause" of the injury. It was the last "link in an unbroken chain of reasonably foreseeable events" which cost the employee his life. Surely this rail

---

[5] Restatement of Torts § 302, Comment *l*. See also Prosser on Torts (1941) § 37, p. 243.

was the "proximate cause" if those words be used to mean an event which contributes to produce a result, which is the meaning Congress intended when it made railroads liable for the injury or death of an employee "due to" or "resulting in whole or in part from" the railroad's negligence.[6] The record shows that two expert witnesses with many years of railroad experience testified that the accident was caused by the defective rail. That one of these witnesses on cross-examination stated the derailment would not have occurred "nine times out of ten" if there had been a sound rail hardly justifies a directed verdict against petitioner. The fact of causation is no different from any other fact and does not have to be proved with absolute certainty; ninety per cent certainty should suffice to make it an issue for the jury. That a sound rail would have given the deceased nine chances out of ten to escape death should be enough to give his family and the community the protection which the Act contemplates.

Mr. Justice Douglas, Mr. Justice Murphy, and Mr. Justice Rutledge concur in this opinion.