Patricia Ann **LEVIN**, Appellant,

v.

**WEAR EVER ALUMINUM, INC.** and **Edmond Kennedy, Jr.**

**No. 19105.**

United States Court of Appeals, Third Circuit.

Argued April 6, 1971.

Decided May 25, 1971.

See also, 3 Cir., 427 F.2d 847.

Robert M. Ross, Richter, Syken, Ross, Binder & O'Neill, Philadelphia, Pa., for appellant.

Joseph V. Pinto, White & Williams, Philadelphia, Pa. (Thomas R. White, Jr., Philadelphia, Pa., on the brief), for appellees.

Before GANEY, VAN DUSEN and GIBBONS, Circuit Judges.

## OPINION OF THE COURT

GANEY, Circuit Judge.

This diversity action was brought to recover damages for personal injuries sustained on December 4, 1964. On that day, plaintiff, Patricia Ann Levin, was walking south across 34th Street at the intersection of Chestnut Street in Philadelphia, Pennsylvania, and was struck by a car driven by Edmond Kennedy, Jr., who had just finished calling on a prospective customer about an order for some "Wear-Ever" products and was then on his way to see another. Plaintiff sued both Wear-Ever Aluminum, Inc. ("the Company") and Kennedy. At the trial, plaintiff produced evidence for the purpose of showing that Kennedy was an employee of the Company at the time. On the other hand, the Company produced evidence tending to show that Kennedy was an independent contractor. The trial court granted the Company's motion under Rule 50(a) of the Federal Rules of Civil Procedure for a directed verdict. Plaintiff's motion for a new trial on the agency issue involving the Company was refused on the ground that she had failed to meet her burden of proof on that issue, 306 F.Supp. 511. After judgment was entered on the verdict in favor of plaintiff against Kennedy, she appealed from the trial court's refusal to grant her a new trial against the Company.

In Green v. Independent Oil Co., 414 Pa. 477, 483–484, 201 A.2d 207, 210 (1964), the court said:

"In ascertaining whether a person is an independent contractor, the basic inquiry is whether such person is subject to the alleged employer's control or right to control with respect to his physical conduct in the performance of the services for which he was engaged. * * *

"The hallmark of an employee-employer relationship is that the employer not only controls the result of the work but has the right to direct the manner in which the work shall be accomplished; the hallmark of an independent contractee-contractor relationship is that the person engaged in the work has the exclusive control of the manner of performing it, being responsible only for the result. * * *" (Footnote and cited cases omitted.)

In the same case the Court noted:

"If the facts as to such relationship are in dispute, it is the function of a jury to determine the precise nature of the relationship between the parties." (Cited case omitted.)

The rule as to the function of the jury is the same in the Federal courts. Ma-

genau v. Aetna Freight Lines, Inc., 360 U.S. 273, 79 S.Ct. 1184, 3 L.Ed.2d 1224. Each case is to be decided on its own facts. George v. Nemeth, 426 Pa. 551, 554, 233 A.2d 231, 233 (1967).

In April of 1963, Kennedy entered into a written agreement with the Company. Under the agreement Kennedy was authorized to solicit purchasers of cooking and eating utensils made by the Company. It was contemplated that he would do so in the Counties of Luzerne and Lackawanna, Pennsylvania, on a non-exclusive basis. The Company agreed to ship all "Wear-Ever" products included in orders sent in by him "that have been accepted by the Company." He was to be paid a commission on all sales except those products sold at or below the current retail price list. He was to be allowed a 30% commission on all cash sales except those products classified as "Special for Shoppers" and 20% on sales paid for under the Company's deferred payment plan. He was required to post a $200 performance bond for which he paid the annual premium of six dollars. The agreement was automatically renewable for successive terms of one year each unless prior to December 31st of any year either party notified the other to the contrary.[1]

At the time he entered into the agreement, Kennedy was employed by the Social Security Administration, and therefore was not free to devote full time to soliciting orders for "Wear-Ever" cooking utensils. During his first week, he was required to undergo a training program by accompanying other Company distributors during the day as an observer and then in the evenings he attended "drill classes" conducted by employees of the Company. At these classes he reviewed the day's transactions, observed demonstrations on how to show the products to specific advantage and learned some of the techniques used by distributors in obtaining orders. He was instructed not to tell untruths about the products to potential customers. For example, he could not tell them that if they cooked food in "Wear-Ever" products, it would be better for them or that less food would be required to satisfy their hunger.[2] He was told that he was not permitted to increase or cut prices.

Thereafter, Kennedy sought out customers in the territory allotted him in the agreement and took their orders. He carried pamphlets, with his name stamped on them, showing all the "Wear-Ever" products. He would leave one of them with a potential customer. He sometimes brought along samples for demonstration purposes. When he obtained an order he was required to report in the written application that he received payment in cash (including sales tax) or a down payment of at least 20% of the list price determined by the Company, otherwise the order would not be approved by the Company. Although he accepted credit applications, Kennedy had no authority to vary the terms of a proposed sale or to extend credit. He turned in his orders, some with credit applications, to the Company's office for its approval, retaining his commission. If an order was not accepted, he was required to return the commission to the customer. On occasions, without

---

1. Paragraph 4 of the agreement recites: "The Distributor being an independent contractor and not an employee, the Company does not reserve any direction or control with respect to his activities in his independently established business." In George v. Nemeth, 426 Pa. 551, 554, 233 A.2d 231, 233 (1967), the Court stated: "Although the Distribution Agreement signed by Nemeth and Freihofer specifically refers to their relationship as being one of an independent contractor, this is not determinative of the matter for

it is the actual practice between the parties which is crucial." See Feller v. New Amsterdam Cas. Co., 363 Pa. 483, 70 A.2d 299 (1950); Eggelton v. Leete, 186 Pa.Super. 542, 142 A.2d 777 (1958).

2. In May of 1958, Wear-Ever Aluminum Inc. entered into an agreement with the Federal Trade Commission to refrain from making certain untrue representations in the obtaining of orders for its products. At the time of trial, Kennedy was unaware of this agreement.

the consent of the Company, he had accepted less than his allotted commission.[3] This was the only way he could vary the price. None of Kennedy's orders were turned down by the Company. When an order was accepted as a sale, the Company sent the products to the customer and bore the expense of shipment. The Company was responsible for collecting any balance due and the sales tax.

The Company employed a divisional sales manager for each of its territories. An order of Kennedy's taken outside his assigned territory would not by accepted by the Company unless it was approved by the divisional sales manager of that area.

Between the end of May, 1964, and the beginning of October, Kennedy did not take any orders for "Wear-Ever" products. In October, he was assigned to a new territory and resumed writing up orders. The new territory included the large area of the Counties of Philadelphia, Bucks, Chester, Delaware and Montgomery in Pennsylvania, New Castle County and the City of Wilmington in Delaware, and New Jersey, south of Ocean County. During the months between September and December, 1964, Kennedy worked as a milk delivery man for Breuninger's dairy company and in his spare time he would obtain orders for "Wear-Ever" products.

During the months immediately preceding the accident, Kennedy was required to attend weekly meetings at the Company's office in Philadelphia. At these meetings, he reported the number of calls he made and the orders accepted during the interval of the last meeting. There he was shown new selling techniques and given inspirational selling talks by employees of the Company.

In getting about Kennedy used his own car which bore no Company insignia or reference to its name. He was not told by the Company how to operate his car. He incurred the expense of driving and maintaining it. The Company did not provide him with an expense or drawing account.

The Company did not determine the days or hours in which Kennedy applied himself in soliciting orders. He was not required to fill out time sheets nor required to call on certain customers. He had no minimum quotas to meet. He was not required to wear a uniform or a certain style cap. The Company did not provide him with a car nor require him to drive one.

■ Where the evidence is such that, without weighing the credibility of the witnesses, there can be but one reasonable conclusion as to the verdict, the trial judge should determine the proceedings by a directed verdict or judgment n.o.v. Brady v. Southern R.R., 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239 (1943). However, where the evidence is conflicting, or there is insufficient evidence to make a "one-way" verdict reasonably possible, a directed verdict is improper. Delk v. St. Louis & S. F. R. R., 220 U.S. 580, 31 S.Ct. 617, 55 L.Ed. 590 (1911).

■ We think the trial court properly allowed the Company's motion for a directed verdict. At the outset the automobile used by Kennedy was not under the Company's actual or potential control at the time of the accident and the use of it by Kennedy was not of vital importance to the Company in furthering its business. See Morris v. Ward, 345 Pa. 226, 26 A.2d 926 (1942). Additionally, the control which the Company exercised or had the right to exercise over Kennedy was insufficient for the jury to find that an employee-employer relationship existed between Kennedy and the Company. Kennedy summed it

---

3. Under the "merchandise specials" plan, Kennedy, was permitted to buy from the company certain items far below the retail price. Thus, he was permitted to purchase a casserole, listed at $12.95, for $2.25. However, such items were used by him mostly to induce the potential customer to order other products. He received no commission on the sale of these items.

up best when he testified: "On occasion, I was told to go places, but generally I was on my own." Transcript of Testimony, p. 264 (App. 77a). The evidence supports this assertion.

The judgment of the district court will be affirmed.