Kenneth **KELLNER**, Plaintiff,

v.

Leonard R. **SAYE**, Defendant.

Civ. No. LV–1380.

United States District Court,
D. Nevada.

July 16, 1971.

R. L. Gilbert, Morrill, Neb., Carl J. Christensen, Las Vegas, Nev., for plaintiff.

Morton Galane, Las Vegas, Nev., for defendant.

## MEMORANDUM ORDER GRANTING MOTIONS FOR DIRECTED VERDICTS

ROGER D. FOLEY, Chief Judge.

Plaintiff sued defendant on a promissory note in the amount of $28,750.00, plus interest. Defendant admits liability but asserts counterclaims against plaintiff. The case was tried to a jury. At the conclusion of defendant's evidence in support of his counterclaims, plaintiff moved for directed verdicts in his favor on the promissory note and against de-

fendant as to defendant's counterclaims. The Court directed a verdict in plaintiff's favor on the promissory note but denied the motion as to the defendant's counterclaims. After the close of all of the evidence plaintiff renewed his motion for a directed verdict as to the counterclaims and the Court granted the motion, indicating that it would file a written memorandum explaining its reasons for directing a verdict against defendant.

## I. THE PROMISSORY NOTE

Liability being admitted and the amount being stipulated, a verdict in favor of plaintiff and against defendant on the promissory note is entered in the sum of $33,925.00, which includes interest to July 1, 1971.

## II. DEFENDANT'S COUNTER-CLAIMS

(A) THE CLAIM THAT PLAINTIFF KELLNER IS PERSONALLY LIABLE TO DEFENDANT SAYE FOR DAMAGES FOR BREACH OF PREINCORPORATION AGREEMENTS.

### (1) THE UNCONTROVERTED EVIDENCE

Plaintiff Kellner, defendant Saye, James Wenzel and Douglas Fleming met in Las Vegas in November of 1963 with one, Cavett Robert. Robert had some familiarity with the formation of cemetery companies and the sale of cemetery lots on a preneed basis. Robert held an option to purchase 40 acres of unimproved raw desert land near Las Vegas. Robert discussed with plaintiff, defendant, Wenzel and Fleming the acquisition of the 40 acres and the development of the same for cemetery purposes. An agreement was orally made between plaintiff, defendant, Wenzel and Fleming that the four of them would form a Nevada corporation, purchase the land and develop a cemetery. The purchase price of the 40 acres was $244,000.00. The terms were: $85,000.00 down; the assumption, by the purchasing corporation

to be formed, of two notes secured by a first and second deed of trust on the property in the amount of $73,840.00; the sellers to take a note for the balance of the $244,000.00, or $85,160.00, secured by a third deed of trust on the said property.

Plaintiff, defendant, Wenzel and Fleming agreed to purchase the 40 acres and develop the same as a cemetery in the manner outlined to them by Cavett Robert. Plaintiff Kellner put up $115,-000.00:

| | |
|---|---|
| $ 28,750.00 | for 25% of the stock in the corporation; |
| 28,750.00, | a loan to defendant Saye for his purchase of 25% of the stock in the corporation; |
| 28,750.00, | a loan to Wenzel for his purchase of 25% of the stock in the corporation; |
| 28,750.00, | a loan to Fleming and his partner Phelps for their purchase of 25% of the stock in the corporation. |
| $115,000.00 | TOTAL |

Each of the borrowers agreed to give plaintiff Kellner a note for $28,750.00 to be secured by a pledge of the stock certificate issued to each of them. (Defendant's failure to pay his note to plaintiff when due gave rise to this litigation.)

The $115,000.00 was by agreement of the four parties to be expended as follows:

| | |
|---|---|
| $85,000.00 | down payment on the 40 acres |
| 25,000.00 | for a perpetual trust fund |
| 5,000.00 | operating funds |
| $115,000.00 | |

Robert represented to plaintiff, defendant, Wenzel and Fleming that $5,-000.00 would be adequate capital to begin operation of the cemetery corpora-

tion and assured the parties that the sale of cemetery lots, crypts and niches on a preneed basis would provide the cemetery corporation with sufficient income to pay sales costs, operating expenses, make necessary improvements, and meet the payments as they became due on the indebtedness secured by the deeds of trust.

On November 22, 1963, plaintiff, defendant, Wenzel and Fleming entered into a written preincorporation agreement which is Exhibit CO in evidence. The document provided in part:

"It is further agreed among the parties that JAMES C. WENZELL and LEONARD R. SAYE are to have a thirty-five (35%) percent sales contract and are to be the exclusive sales agents of the corporation for the sale of lots, markers, mausoleum crypts, and collumbarium niches."

The agreement contains no express provision as to the *term* of the sales agency.

The cemetery corporation was formed in early 1964 as Paradise Memorial Gardens, Inc., a Nevada corporation (P.M.G.). Shortly thereafter, Wenzel and defendant began to function in a partnership as the exclusive sales agency for P.M.G., known as Saye-Wenzel Co. Neither defendant nor Wenzel had prior experience in selling cemetery property. Saye-Wenzel Co. began preneed selling of cemetery lots, crypts and niches in the Las Vegas area in the spring of 1964 and continued such sales activities until the end of May 1965. A written exclusive sales agency agreement between P.M.G. and Saye-Wenzel Co. was drafted but never executed. This document is Exhibit BZ in evidence and it bears the date "the _____ day of April, 1964". BZ contains no express provisions as to the *term* of the sales contract, providing only in paragraph 1(b) thereof:

"This agreement shall terminate upon the mutual agreement of the Parties hereto."

On or about May 30, 1965, plaintiff, defendant, Wenzel and Fleming met again in Las Vegas and P.M.G. entered into a written exclusive sales agency contract with defendant under the name of Saye-Len Co. This document is Exhibit CP in evidence and is dated June 1, 1965. CP contains no express provisions as to the *term* of the sales contract, providing only in paragraph 1(b) thereof:

"This agreement shall terminate upon the mutual agreement of the Parties hereto."

Defendant conducted his sales agency business exclusively for P.M.G. until the spring of 1966. On one or more days, including February 18, 1966, plaintiff, defendant, Wenzel and Fleming met in Las Vegas on P.M.G. business and on February 18, 1966, by corporate action defendant's exclusive sales agency contract was terminated.

### (2) THE CLAIMS OF THE PARTIES.

(a) Defendant claims that the termination of his exclusive sales contract on February 18, 1966, was a breach of contract by P.M.G. and that it was also a breach by plaintiff of the parties' oral preincorporation agreements, entitling defendant to damages for such breach from plaintiff.[1]

(b) Plaintiff claims that the termination of defendant's exclusive sales agency, on February 18, 1966, was by P.M.G. and not by him; that the preincorporation agreements had long before been fully performed; that the termination by P.M.G. was for cause; and that P.M.G. had the power to so terminate defendant's exclusive sales agency agreement.

### (3) THE PAROL EVIDENCE.

Over objections of plaintiff's counsel who raised the parol evidence rule, the Court allowed both parties to offer parol evidence of their preincorporation

---

[1]. It would seem that Wenzel and Fleming would also be liable under this theory. But only plaintiff is sought to be held liable for breach of the preincorporation agreements.

understandings, evidence as to conversations had between plaintiff, defendant, Wenzel and Fleming prior to the execution of the written preincorporation agreement dated November 22, 1963, Exhibit CO in evidence.

### (a) THE SAYE VERSION.

Defendant Saye testified that it had been agreed between the four parties that the exclusive sales agency was to be a permanent arrangement, was to continue for the business life of the cemetery corporation, and until all of the cemetery lots, crypts and niches were sold.

### (b) THE KELLNER, WENZEL AND FLEMING VERSION.

Plaintiff Kellner, Wenzel and Fleming all testified that the parties, including defendant, had agreed that the exclusive sales agency was to continue only so long as that agency by its sales efforts produced income sufficient to pay sales costs, operating expenses, make necessary improvements and meet the payments as they became due on the indebtedness secured by the deeds of trust. Plaintiff, Wenzel and Fleming each further testified that all of the parties, including the defendant, had agreed that if the exclusive sales agency failed to generate income sufficient for such purposes other sales arrangements would be made.[2]

### (4) ANALYSIS OF THE EVIDENCE.

### (a) THE PAROL EVIDENCE.

Like the written preincorporation agreement, Exhibit CO, the sales agency contracts, Exhibits BZ and CP, do not expressly provide for the *term* of the exclusive sales agencies. Clauses 1(b) of Exhibits BZ and CP above quoted do not define the term but provide merely that the contract shall be terminated when the parties thereto so agree.

This language adds nothing by way of *term* because any contract can always be terminated by agreement of the parties thereto. (With certain exceptions not applicable here, i. e., intervening rights of third parties.)

Since the *term* of the exclusive sales agencies cannot be ascertained from the express language of the writings, Exhibits CO, BZ and CP, it was proper to receive parol evidence as to the *term*. Cases cited by counsel relative to inferences to be drawn from the writings as to *term* where the same is not expressly provided are inapplicable since there is competent parol evidence here as to the *term*.

### (b) THE MOTION FOR DIRECTED VERDICT AGAINST DEFENDANT SAYE RE PLAINTIFF'S PERSONAL LIABILITY FOR BREACH OF THE PREINCORPORATION AGREEMENTS.

(i) In Brady v. Southern R.R., 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239, the Supreme Court announced the standard in the following terms:

"When the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict, the court should determine the proceeding by * * * directed verdict * * * without submission to the jury * * *. By such direction of the trial the result is saved from the *mischance of speculation over legally unfounded claims*." (Italics added.)

Vol. 5 Moore's Federal Practice, § 50.02[1], p. 2321:

" * * * a verdict may properly be directed when, without weighing the credibility of the witnesses, there can be but one reasonable conclusion as to the verdict."

It is unreasonable to conclude from the uncontroverted evidence detailed supra (excluding the controverted parol evi-

---

2. Implicit in both versions of the oral preincorporation agreements as to the *term* of the exclusive sales agency is that the sales agents would perform their work honestly, diligently and to the best of their ability.

dence) that plaintiff, defendant, Wenzel and Fleming would agree to give to two of their number (and as it later developed, to one of their number) permanent exclusive sales agencies that would continue for the business life of the cemetery operation and until all of the lots, crypts and niches were sold, without regard to the financial position of the cemetery business as it may change from time to time in the future and without regard to the amount of income generated by the exclusive sales agents and the availability of sales earnings to be applied to corporate obligations.

Considering the uncontroverted evidence, together with the controverted parol evidence, but without considering the credibility of the defendant on the one hand and plaintiff, Wenzel and Fleming on the other, the only reasonable conclusion as to the verdict that can be reached is that the version of Kellner, Wenzel and Fleming as opposed to the Saye version is correct and that the *term* of the exclusive sales agency was intended to be as testified to by plaintiff, Wenzel and Fleming.

Thus it follows that the preincorporation agreements, both oral and written, were fully and completely performed when Saye-Wenzel Co. were given an exclusive sales agency which they conducted from the spring of 1964 through May 1965. Certainly the preincorporation agreements were fully and completely performed when, if not before, Saye entered into an exclusive sales agency with P.M.G. on June 1, 1965. The action taken terminating Saye's contract on February 18, 1966, coming many months after full and complete performance of the preincorporation agreements were corporate action only and not the action of plaintiff personally.

(ii) At page 2325 of Volume 5, Professor Moore states, in connection with a discussion of the *Brady* rule:

"This is not to suggest that the party moving for a directed verdict does not have a significantly difficult burden

of persuasion. For the established rule requires the trial court to view the evidence in the light most favorable to the party against whom the motion is made."

Accepting for the purposes of the motion for directed verdict the Saye version of the parol preincorporation agreements as true, did plaintiff perform the preincorporation agreement or did he breach the same when the Saye-Len Co. contract was terminated on February 18, 1966? Here again, assuming the Saye version to be correct, the only reasonable conclusion is that the preincorporation agreements were fully and completely performed when Saye-Wenzel Co. were given an exclusive sales agency which they conducted from early 1964 through May 1965. Assuming again the Saye version, certainly the preincorporation agreements were fully and completely performed when, if not before, Saye alone entered into an exclusive sales agency contract with P.M.G. on June 1, 1965. From June 1, 1965, until February 18, 1966, Saye had an exclusive sales agency with no *term* expressed in writing and, under the Saye version, the exclusive contract was a permanent agreement and would continue so long as the cemetery property remained unsold. Even under the Saye version, *Saye then had received all that he testified plaintiff Kellner had said he should have. All preincorporation promises said by Saye to have been made by Kellner had been fulfilled.* When months later in February 1966 Saye's contract was terminated, it was by corporate action only. It cannot reasonably be argued that by voting in favor of corporate action to terminate the Saye contract plaintiff Kellner violated preincorporation agreements which had months before been fully and completely performed.

(B) THE CLAIMS THAT PLAINTIFF KELLNER IS DERIVATIVELY LIABLE TO DEFENDANT SAYE FOR MONEY DUE SAYE FROM P.M.G. AND FOR P.M.G.'S

BREACH OF SAYE'S EXCLUSIVE SALES AGENCY CONTRACT.

█ NRS 78.625 reads in pertinent part:

"1. No corporation which shall have refused to pay any of its notes or otther obligations, when due, in lawful money of the United States, nor any of its officers or directors, shall transfer any of its property to any of its officers, directors or stockholders, directly or indirectly, for the payment of any debt, or upon any other consideration than the full value of the property in cash.

" *    *    *

" *    *    *

"6. Every director or officer of a corporation who shall violate or be concerned in violating any provision of this section shall be personally liable to the creditors and stockholders of the corporation of which he shall be director or an officer to the full extent of any loss they may respectively sustain by such violation."

### (1) THE TRANSFER IN QUESTION.

The uncontroverted evidence is that P.M.G. was unable to make payments when due on the notes secured by the deeds of trust. After such default by P.M.G. the creditor proceeded to foreclose upon some thirty-five acres of P.M.G.'s real property. In an effort to avoid foreclosure plaintiff, defendant, Wenzel and Fleming, the shareholders of P.M.G., met several times and discussed making further contributions to P.M.G. Only plaintiff and Fleming were willing to make further contributions. Defendant and Wenzel refused to do so. Then plaintiff and Fleming entered into an agreement with the foreclosing creditor whereby a formerly dormant corporation, "B.K.B.", after foreclosure, acquired the foreclosed upon property. Plaintiff and Fleming put up money and borrowed money from P.M.G.'s perpetual trust fund to thus acquire the foreclosed upon property. P.M.G. was given an option by B.K.B. to reacquire the foreclosed upon real property but the option was never exercised by P.M.G.

### (2) THE FINANCIAL POSITION OF P.M.G.

It is uncontroverted that when defendant filed his counterclaim in his action in May 1969 seeking to hold plaintiff derivatively liable under NRS 78.625, P.M.G. was engaged in business and had assets. P.M.G. made a profit in 1969 and 1970. P.M.G. was still engaged in business at the time of the trial.

### (3) EXECUTIVE MANAGERS.

Defendant and Wenzel were the executive managers of P.M.G. during the term of the Saye-Wenzel Co. exclusive sales agency. Defendant was the sole executive manager during the term of the Saye-Len Co. exclusive sales agency. Both while as an executive sales manager and as sales agent, defendant made loans to P.M.G. and engaged in other financial dealings with P.M.G.

### (4) ASSUMPTIONS FOR PURPOSES OF MOTION FOR DIRECTED VERDICT.

For purposes of the motion for directed verdict, it may be assumed:

(a) That the evidence establishes that P.M.G. is indebted to defendant, both in his capacity as executive manager and as exclusive sales agent;

(b) That the evidence establishes that P.M.G. breached the Saye-Len Co. exclusive sales agency contract when it terminated the same on February 18, 1966, and that Saye sustained damages by said breach;

(c) That there was a transfer of P.M.G.'s property to plaintiff within the meaning of NRS 78.625.

### (5) THE QUESTION OF DERIVATIVE LIABILITY.

Can plaintiff be derivatively liable to defendant Saye under NRS 78.625 for:

(a) P.M.G.'s indebtedness to defendant as executive manager and as exclusive sales agent?

(b) For P.M.G.'s breach of the defendant's exclusive sales agent contract?

## (6) DEFENDANT SAYE IS NOT A CREDITOR WITHIN NRS 78.625 WHO MAY HOLD THE TRANSFEREE STOCKHOLDER, PLAINTIFF KELLNER HERE, LIABLE.

Before plaintiff could be found derivatively liable to defendant under NRS 78.625, defendant would have had to become a judgment creditor of P.M.G., must have levied execution against P.M.G., and have had execution returned unsatisfied.

This Court has not been able to find a Nevada case in point construing NRS 78.625, but language identical to NRS 78.625 is found in Section 66 of the Stock Corporation Law of New York and is set forth in Caesar v. Bernard (1913) reported in 156 App.Div. 724, 141 N.Y.S. 659 at page 661. In both the *Caesar* case and in Ginsberg v. Automobile Coaching Co. (1912), 151 App.Div. 627, 136 N.Y.S. 354, the creditors of the corporation seeking to hold an officer, director or stockholder transferee from the corporation derivatively liable under Section 66 were judgment creditors of the corporation who had levied execution against the corporation and had had the same returned unsatisfied. Section 66 later became Section 15 of the New York Stock Corporation Law. The language remained the same. The New York cases have uniformly followed the rule that a creditor seeking to hold an officer, director or stockholder transferee of property from the corporation derivatively liable under Section 15 of the New York Stock Corporation Law must be a judgment creditor of the corporation, must levy execution and have the same returned unsatisfied before such creditor can seek to hold personally liable the officer, director or stockholder transferee from the corporation.

In Buttles v. Smith (1939), 281 N.Y. 226, 22 N.E.2d 350, that Court stated, at page 353:

"Where an action is brought under * * * section 15 of the Stock Corporation Law, no cause of action accrues to a creditor [of the corporation] until judgment has been obtained and execution returned unsatisfied."

In Hastings v. H. M. Byllesby & Co. (1944), 293 N.Y. 404, 57 N.E.2d 733, at page 735, in reference to the *Buttles* case, the Court stated:

"In that case we held that no cause of action to set aside transfers of corporate property made in violation of section 15 of the Stock Corporation Law * * * accrues to a creditor until the creditor has obtained a judgment and execution has been returned unsatisfied."

Recently, in 1966, the United States District Court for the Eastern District of New York, in Duberstein v. Werner, 256 F.Supp. 515, at page 522, stated:

"[8] Finally, in answer to the trustee's second contention it is necessary to point out that his reliance on Section 15 of the New York Stock Corporation Law is misplaced. That section was repealed by Section 103 of the Business Corporation Law on September 1, 1963, McKinney's Consol.Laws, c. 4, and the saving clause contained in Section 103(b) protecting accrued causes of action, does not aid the plaintiff since on that date there was no accrued cause of action under Section 15 inasmuch as no creditor had obtained a judgment against Raywal at that time and such a judgment-creditor was necessary for a cause of action to accrue. See Buttles v. Smith, 1939, 281 N.Y. 226, 22 N.E.2d 350, 353."

Since defendant is not a judgment creditor of P.M.G., did not levy execution and have execution returned unsatisfied, he cannot, even if the evidence supports the assumptions made in subsection (4) above, hold plaintiff derivatively liable under NRS 78.625.

## (7) SAYE'S CLAIMS WERE NOT LIQUIDATED.

NRS 78.625 does not apply to a creditor whose claims are unliquidated.

Even if it be assumed that defendant need not be a judgment creditor, nevertheless defendant's claims, being unliquidated, are not within the contemplation of NRS 78.625. Both defendant's claim for breach of contract against P.M.G. and the claim that P.M.G. owes him money are unliquidated. The language in NRS 78.625, " * * * other obligations, when due * * * ", excludes unliquidated claims.

### (8) PROOF OF DAMAGES SPECULATIVE.

To prove defendant's damages the result of the alleged breach of the Saye-Len contract, Saye's counsel called William Kleiasth. The Court has read the transcript of this witness's testimony and considers that such testimony is rank speculation and conjecture. See Benham v. World Airways, Inc. (9th Cir. 1970), 432 F.2d 359. Further, the expert opinion given is based upon weak and inadequate foundation. The witness simply was not familiar with P.M.G.'s operation. Had plaintiff moved for directed verdict on this ground, it would have been granted.

### (9) OTHER GROUNDS FOR DIRECTED VERDICT.

It is unnecessary to consider other contentions of plaintiffs made in support of his motion for directed verdict. The failure to discuss the same does not mean that they do not have merit in this Court's opinion.

### III. TAPE RECORDINGS.

After the close of plaintiff's evidence, offered in defense of defendant's counterclaims, on rebuttal, defendant's counsel offered, for impeachment purposes only, to play to the jury a tape recording made by defendant purportedly on February 18, 1966, and kept in his sole possession since then. The Court refused to admit the recording into evidence because of lack of adequate foundation and because of unreliability.

It became evident during the trial that the parties have been bitter adversaries for several years. They have been engaged in litigation in several courts for some time past. This Court considered that any tape recording made and kept alone by one of the parties from 1966 to date to be inherently unreliable. The Court believed it quite probable that such a recording when offered would have been incomplete and altered to support the contentions of the party offering the same. Had plaintiff Kellner offered a similar recording it likewise would have been rejected. The tape recording offered did not, by defendant's own admission, include all conversations between plaintiff, defendant, Wenzel and Fleming that took place over several days leading up to the corporate meeting of February 18, 1966, when defendant's contract was terminated. According to Saye's testimony, the individuals whose voices were recorded did not identify themselves as they spoke. Thus the identity of any speaker would be apparent only to a person auditing the tape recording who could recognize the voice. Although all of the parties to the recorded conversations testified at the trial, it is very doubtful that the Court or the jury would be able to recognize the voices.

### IV. JUDGMENT.

Judgment should be entered in favor of plaintiff and against defendant on plaintiff's complaint, and against defendant and in favor of plaintiff as to defendant's counterclaims.