William J. LEVITT and Simone Levitt, his wife, Plaintiffs-Appellees-Cross Appellants,

v.

DESERT PALACE, INC., Defendant-Appellant-Cross Appellee.

Nos. 723, 724, Dockets 78–7552, 78–7574.

United States Court of Appeals, Second Circuit.

Argued April 30, 1979.

Decided July 6, 1979.

John M. Fitzpatrick, Philadelphia, Pa. (Dilworth, Paxson, Kalish, Levy & Kauffman, Philadelphia, Pa. (Winthrop, Stimson, Putnam & Roberts, New York City, of counsel), for plaintiffs-appellees-cross appellants.

David W. Peck, New York City (Sullivan & Cromwell, Daniel D. Caldwell, New York City, of counsel), for defendant-appellant-cross appellee.

Before LUMBARD, FRIENDLY and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

William Levitt and his wife Simone Levitt were nonpaying guests at Caesar's Palace Hotel and Casino in Las Vegas, Nevada from May 16 through May 19, 1975. They had been invited by the Hotel to attend the Alan King Tennis Tournament which features professional players and celebrities (i. e., movie stars, theatrical and business personalities). Unfortunately as it developed, Mrs. Levitt brought with her an assortment of her jewelry including a 24 carat diamond engagement ring, a diamond wedding band, a sapphire necklace, sapphire earrings and a sapphire ring, claimed in all to be worth in excess of $1,300,000. She also brought other gold and diamond jewelry of lesser value. Shortly after registering, the Levitts deposited the jewelry in the Hotel's safe deposit box where it remained until Saturday, May 18 when the Levitts were to attend a costume ball. Prior to the ball, Mr. Levitt retrieved the jewelry from the box and his wife selected the large diamond engagement ring, the diamond wedding band, the sapphire pieces and several others. Mr. Levitt then returned the case and the rejects to the safe deposit box.

After the ball was over at 1:00 or 1:30 A.M., the Levitts dropped in at the Noshorium, an all-night restaurant off the hotel lobby. Thirty minutes later they returned to their room where Mrs. Levitt placed the jewelry on top of a dresser near the bed. Mr. Levitt then engaged the night lock, or "dead bolt" and they retired. Upon arising late the next morning, Mrs. Levitt instructed her husband to collect the jewelry on the dresser and return it to the safe deposit box. Mr. Levitt scooped up the jewelry, placed it in a hankerchief, and returned the contents to the box. He failed to notice that the major pieces—the two diamond rings, the sapphire ring, necklace and earrings—were missing. Not until later that afternoon after the jewelry case had been brought back to the room did Mrs. Levitt become aware in the course of packing that the five valuable pieces were gone. After the local police and hotel security people were summoned it was discovered that the dead bolt had been tampered with and rendered inoperable.

Invoking diversity jurisdiction, the Levitts brought suit in the United States District Court for the Southern District of New York against Desert Palace, Inc. (the Hotel), the owners and operators of Caesar's Palace. Plaintiffs sought a substantial punitive award and compensatory damages of $1,300,000, and the alleged value of the stolen jewelry. The trial was bifurcated—one jury found the defendant liable for the loss and a second returned a verdict of $548,599 in favor of the Levitts. The Hotel then moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. The Levitts moved for a new trial solely on the issue of damages. All motions were denied in a memorandum decision and order of the Hon. Lee P. Gagliardi, District Judge, on September 27, 1978. Judgment in favor of the Levitts in the sum of $548,-599 was entered on October 3, 1978. This appeal by the Hotel ensued. The Levitts have cross-appealed for a new trial on the issues of damages only if this court orders a new trial on the issue of liability.

### The Standard of Care

The extraordinary standard of care imposed upon the innkeeper at common law originated in the feudal conditions of the Middle Ages, R. Brown, The Law of Personal Property § 102 at 482 (2d ed. 1955), and has long since been ameliorated by state legislation. Id. § 106 at 501. Nevada's pertinent statute provides:

> No owner or keeper of any hotel, inn, motel, motor court, or boardinghouse or lodginghouse in this state shall be civilly liable after July 1, 1953, for the loss of any property left in the room of any guest of any such establishment by reason of theft, burglary, fire or otherwise, in the absence of *gross neglect* upon the part of such keeper or owner.

Nev.Rev.Stat. § 651.010 (emphasis supplied).

The Levitts urge on this appeal, however, that the Nevada "Innkeepers Statute" we have quoted is not applicable because it only purports to cover the loss of property "left" in the room of the guest. Since the jewels were taken while the Levitts were sleeping in the room they claim that the jewels had not been "left" there. Appellees argue, therefore, that the Hotel should be held liable as an insurer on common law principles. Prior to trial the Levitts in the "points for charge" filed with the court asked for an instruction that the defendant was an insurer under Nevada law. Their pre-trial memorandum in support of a motion to amend the complaint [1] also made the argument that the Nevada Innkeepers Statute was not governing since the jewels were not "left" in the room. The same point was reiterated in the motion for a directed verdict at the end of the defendant's case.

On the morning of November 23, 1977, however, Judge Gagliardi delivered to counsel for both sides a copy of his proposed charge and requested comments and objections before delivering it to the jury. The charge on the liability issue was framed only in terms of gross neglect under the Nevada statute and made no reference at all to any common law liability. Yet counsel for the Levitts took no exception to the charge on this point even though he did specifically object to other aspects of the charge, including the instruction on contributory negligence. Furthermore, the trial judge stated to both counsel: "I am going to say that this is a civil case for them to find out whether the defendant is liable to the plaintiff under the special provisions of the statute under the laws of Nevada . . . ." Counsel for the Levitts responded, "Yes, sir. That would be all right." After the charge was given and counsel were asked if they had any exceptions, the attorney for the Levitts responded, "Your, Honor, I have no exception other than that you refused to give my points earlier." It could be argued that counsel's term "points" referred to the initially filed "points for charge" which included, *inter alia*, the "left" argument. More realistically, the phrase would seem to refer to those points made earlier that morning in the robing room, especially since the objection by Levitts' counsel to the instruction on contributory negligence had not caused the trial judge to alter the charge on that issue. Such an interpretation is made even more likely by the fact that during that conference the Levitts' attorney had specifically acquiesced in the reading to the jury of the Nevada gross negligence charge.

■ Thus, although the Levitts had raised the question of the standard of care owed them by the Hotel on several occasions earlier in the proceedings their counsel made no specific reference whatsoever to this key issue when the jury charge was submitted for his inspection and comments. Even more importantly, the record indicates his affirmative approval of the trial court's proposed version of the critical portion of the charge. The acquiescence of the Levitts' counsel in the jury instruction on gross negligence precludes appellate review of the propriety of that portion of the charge.[2] Fed.R.Civ.P. 51; see *Wilson v. Crouse-Hinds Co.*, 556 F.2d 870, 875 (8th Cir. 1977) (en banc), cert. denied, 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455 (1977). See also *Spano v. N. V. Koninklijke Rotterdamsche Lloyd*, 472 F.2d 33, 34 (2d Cir. 1973) (per curiam).

### Gross Negligence

The state courts of Nevada have not yet construed its Innkeepers Statute, Nev.Rev.

---

1. Subsequent to the completion of discovery and some eighteen months after the filing of the complaint in this action, plaintiffs moved to amend their complaint to accommodate the theory that the defendant was liable for breach of a common law innkeeper's duty. The district judge denied the motion to amend and plaintiffs have not challenged the propriety of that denial on this appeal.

2. While we need not reach the issue, we do note that appellees' construction of the Nevada statute would have the anomalous effect of requiring the innkeeper to exercise the highest degree of care while the guest was in the room, presumably the time when the risk of theft would be slightest.

Stat. § 651.010. Judge Gagliardi did charge the jury, however, in the language employed by the highest court of the State in *Hart v. Kline*, 61 Nev. 96, 116 P.2d 672 (1941), which construed the phrase "gross negligence" in the context of the Nevada automobile guest statute:

"Gross negligence is substantially and appreciably higher in magnitude and more culpable than ordinary negligence. Gross negligence is equivalent to the failure to exercise even a slight degree of care. It is materially more want of care than constitutes simple inadvertence. It is an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care. It is very great negligence, or the absence of slight diligence, or the want of even scant care. It amounts to indifference to present legal duty, and to utter forgetfulness of legal obligations so far as other persons may be affected. It is a heedless and palpable violation of legal duty respecting the rights of others. The element of culpability which characterizes all negligence is, in gross negligence, magnified to a higher degree as compared with that present in ordinary negligence. Gross negligence is manifestly a smaller amount of watchfulness and circumspection than the circumstances require of a prudent man."

Both parties to this appeal accepted the *Hart* definition as charged and we see no purpose now in considering other definitions more or less pejorative depending upon the vocabulary of the author. Suffice it to say the issue for this court is whether on the evidence adduced at trial the jury could reasonably have found that the Hotel failed to exercise even a slight degree of care to safeguard the Levitts against the loss incurred. The standard to be applied on a motion for judgment notwithstanding the verdict is exacting—the evidence must be viewed most favorably to the Levitts here and the trial court's denial of the motion should be disturbed only if we find that "the evidence is such that without weighing the credibility of the witnesses

there can be but one reasonable conclusion as to the verdict." *Brady v. Southern Railroad Co.*, 320 U.S. 476, 479–80, 64 S.Ct. 232, 88 L.Ed. 239 (1943); *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir. 1970). After reviewing the entire record we are persuaded that the evidence presented was insufficient to warrant submission to the jury of the issue of gross neglect and that a jury could not rationally find that the hotel did not exercise even slight care in protecting the Levitts' property.

The jury could reasonably have inferred from the evidence adduced that someone entered the Levitts' room when it was unoccupied early in the day on May 18 and removed the dead bolt by taking out the screws which held it to the door. It was replaced with a mechanism which appeared to function but which in fact was inoperative. While the Levitts were asleep the cylinder door lock was again "picked" and the jewelry stolen, the dead bolt having provided no protection at all against entry. There was evidence by one of plaintiffs' expert witnesses, a New York City Police Department Detective, that all cylinder locks are ineffective when manipulated or picked by an experienced thief. He also testified that a dead bolt which is operative and set by the room occupant cannot be picked and can only be overcome from the outside by literally breaking down the door. The jury could reasonably find therefore that the dead bolt in the Levitts' room had been tampered with and was inoperative on the night in question.

The record is further clear that there had been two instances of dead bolt doctoring at the hotel a year before the Levitts' visit and a third just a few weeks before they arrived. In essence this case turns on whether in the face of this risk the Hotel responded with at least a slight degree of care.

After the first two incidents of dead bolt tampering, some five or six months before the Levitts' visit, the Hotel commenced a program to make their dead bolts "tamper proof." The screws which held the dead bolt were replaced with rivets which could

not be unscrewed. To make extraction even more difficult a screw was inserted sideways through the dead bolt and into the door. The indentation over the screwhead was filled with putty and covered. The Hotel's program for upgrading the dead bolts for its 1200 rooms was proceeding on an almost daily basis but had not yet reached the room assigned to the Levitts.

The evidence establishes without doubt that the Hotel had recognized the possibility of dead bolt tampering and had responded in a way which would have virtually eliminated the problem. There was no evidence at all in the case that other hotels in the area had done more or, in fact, had done anything at all to cure the problem. The Levitts' expert witness on hotel security admitted that the cylinder locks in Caesar's Palace were rekeyed every six months, far more frequently than the one in one-half to two year intervals for rekeying locks in the hotel which he managed. He further testified that at his hotel, defective dead bolts were simply replaced individually as they were discovered. In contrast, appellant was engaged in a program to replace the dead bolt locks in every room in the Hotel. Moreover, although the dead bolt in the Levitts' room had not yet been reworked, there was testimony that the house-keeping staff had been given instructions to check the dead bolts daily to ensure that the mechanisms were functioning properly.

Furthermore, the evidence demonstrated that the Hotel had undertaken other substantial security measures. In addition to a regular force of 55 Hotel guards, 39 additional security personnel patrolled the premises during the tennis tournament week. One guard was stationed at the first floor of the elevator bank which serviced the new addition of the Hotel where the Levitts were quartered. Upstairs, plain-clothes guards made unscheduled rounds of the corridors outside the guest rooms. These random patrols were supplemented by a fire watch from 10 P.M. to 6 A.M. during which uniformed guards made hourly patrols through every corridor. Although their function was to detect fires, they were also told to watch for suspicious persons.

The appellees argue that in view of the Levitts' wealth, special precautions beyond those mentioned above should have been taken for them. However, as even the Levitts' counsel noted in his opening, the tournament was a gala affair; numerous celebrities and wealthy people "like the Levitts" resided at the Hotel during the week-long festivities. Thus a great many of those attending the tournament would have been expected to bring very expensive jewelry and no reason for singling out the Levitts for particular attention was demonstrated. In any case, in addition to augmenting its security force by 70% for the event, the Hotel informed its patrons by a notice on their guest registration forms as well as by signs posted in every guest room of the availability of safe deposit boxes for the storage of valuables. Upon request the Hotel provided an escort service (of which the Levitts did not deny they were aware) so that guests would feel secure in making the trip from their rooms to the safe deposit boxes located off the lobby. Certainly the Hotel could reasonably expect that its guests who had precious jewelry and other valuables would avail themselves of these facilities. Indeed, the Levitts conceded that on every night during their stay at the Hotel except that on which the theft occurred they had stored the jewelry in one of the Hotel's safe deposit boxes.

With the inevitable advantages of hindsight it can be argued that the Hotel would have been more prudent to implement speedier albeit somewhat less effective methods of hindering dead bolt tampering. But the issue before us is simply whether the Hotel exercised even slight care to insure the safety of its guests' property from that risk. The record overwhelmingly supports the conclusion that the Hotel not only satisfied that standard but responded with more than slight care. Viewing the evidence most favorably to the Levitts we are nonetheless constrained to find as a matter of law that there was insufficient evidence on this record to support the verdict of the jury and that the trial judge erred in failing

to grant the motion to set aside the judgment notwithstanding the jury verdict.

This disposition of the matter makes it unnecessary for us to reach appellant's argument that the Levitts were contributorily negligent in not using the safe deposit boxes provided by the Hotel. Our resolution also moots the Levitts' cross-appeal for a new trial on the issue of damages.

Judgment for plaintiffs is reversed and the case remanded for entry of judgment in favor of the defendant.